[No. B170659. Second Dist., Div. Eight. Aug. 2, 2004.]

FRANK T. VEGA, Plaintiff and Appellant, v.
JONES, DAY, REAVIS & POGUE, Defendant and Respondent.

## Counsel

Manuel R. Ramos for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, James P. Fogelman, Joel M. Tantalo and Sarah R. Long for Defendant and Respondent.

OPINION

**BOLAND, J.—**

## SUMMARY

A shareholder in a company acquired in a merger transaction sued the law firm which represented the acquiring company for fraud. He alleged the law firm concealed the so-called toxic terms of a third party financing transaction, and thus defrauded him into exchanging his valuable stock in the acquired company for "toxic" stock in the acquiring company. The law firm demurred. It contended it made no affirmative misstatements and had no duty to disclose the terms of the third party investment to an adverse party in the merger transaction. We conclude the complaint stated a fraud claim based on nondisclosure. The complaint alleged the law firm, while expressly undertaking to disclose the financing transaction, provided disclosure schedules that did not include material terms of the transaction.

## FACTUAL AND PROCEDURAL BACKGROUND

Frank T. Vega (Vega), a 23 percent shareholder in a company known as Monsterbook.com, sued Jones, Day, Reavis & Pogue (Jones Day), a law partnership, for fraud and negligent misrepresentation in connection with a merger transaction. In the merger transaction, Jones Day represented Transmedia Asia Pacific, Inc., which acquired Monsterbook. Monsterbook and Vega were represented by the law firm of Heller, Ehrman, White & McAuliffe (Heller Ehrman).

The terms of the acquisition included Vega's receipt of restricted stock in Transmedia in exchange for his interest in Monsterbook. Monsterbook and Vega accepted the merger offer on March 8, 2000. Closing occurred on April 13, 2000, when the two companies exchanged stock based on a $15 million valuation of Monsterbook. Vega thus exchanged stock valued at $3.45 million for the restricted Transmedia stock.

During the weeks between Vega's acceptance of the merger offer on March 8 and the closing on April 13, Transmedia, which "[e]verybody knew . . . was an iffy company," sought and secured $10 million in investment financing from a third party.[1] The terms of Transmedia's $10 million third party

---

[1] Transmedia's Form 10-K annual report for fiscal year 1998, filed with the Securities and Exchange Commission, indicated Transmedia's working capital deficit raised "substantial doubt about its ability to continue as a going concern," and that its ability to do so was dependent on its ability to continue to effect sales of equity securities and issue of debt. Its annual report for fiscal year 1999, filed January 13, 2000, showed a slightly larger working capital deficit, decreased revenues and an increased net loss.

financing transaction included so-called toxic stock provisions, under which the investors received convertible preferred stock that seriously diluted the shares of all other Transmedia stockholders. Both Transmedia and Jones Day knew that "toxic" stock financing is a "desperate and last resort of financing for a struggling company" and that 95 percent of companies who engage in such financing end up in bankruptcy.

Jones Day prepared a two-page disclosure schedule that clearly described and properly disclosed the "toxic" provisions of the $10 million investment, but did not send the disclosure to Vega, Monsterbook or Heller Ehrman. Jones Day knew that a full disclosure of the "toxic" terms of the financing would have "killed the acquisition," without which Transmedia would not have obtained the financing and would have gone out of business. Instead, Vega, Monsterbook and Heller Ehrman were told, on about March 16, 2000, that the $10 million financing then being negotiated was "standard" and "nothing unusual" and that Jones Day and Transmedia would supply additional documents to support these characterizations of the financing.[2] No documents showing the "toxic" nature of the investment were provided; instead, Jones Day supplied Heller Ehrman with "a different sanitized version" of the disclosure schedule which did not include the "toxic" stock provisions.

Jones Day also prepared, and Transmedia sent to Monsterbook and Vega, a consent form concerning the $10 million investment, which Vega signed. The consent form stated that the $10 million investment would be convertible into an aggregate maximum of 6,815,000 shares of common stock, "thus misrepresenting that it fell within the 20% dilution 'toxic' cap mandated by NASD Rule 4350(i)(1)(D)." On March 28, 2000, two weeks before the closing of Transmedia's acquisition of Monsterbook, Jones Day filed a "Certificate of Designation" with the Delaware Secretary of State, certifying the creation of the convertible preferred stock. This document, available to the public, contained all the terms of the financing, including the "toxic" provisions.

The closing of the Monsterbook acquisition occurred on April 13, 2000. Eight months later, on December 14, 2000, Vega learned for the first time,

---

[2] On March 16, 2000, Heller Ehrman sent an e-mail informing Monsterbook and Vega as follows: "On another note, I received a call from the lawyers for Transmedia. . . . There are a couple of disclosure issues relating to Transmedia that came up. Specifically, they are revising their most recent 10K (annual report) and are also about to close a private stock financing. Neither of these were included in the disclosure schedules that they sent to us, and they want them included—which means that they have to wait until they sort out their books. I have not spoken directly with their attorneys, we've just traded phone messages. Tom Stromberg who has been working on this deal also gave them a call. Neither we nor Transmedia's attorneys think that this is a big deal as it relates to the MonsterBook acquisition, but it will delay closing."

through a press release issued by Transmedia, about the "toxic" stock provision of the $10 million financing. Several legal actions ensued.

First, on October 2, 2001, Monsterbook's former majority shareholder, William H. McKee, who had owned 70.125 percent of Monsterbook's stock, sued Heller Ehrman for legal malpractice. In a first amended complaint on November 21, 2001, McKee and a second shareholder, Paul R. Estrada, who had held a 1.486 percent interest in Monsterbook, also named Transmedia and Jones Day as defendants, alleging causes of action for fraud and negligent misrepresentation.

Second, on December 14, 2001, another shareholder, John Cuero, who had held a 2 percent interest in Monsterbook, sued Heller Ehrman, Jones Day, and Transmedia. This suit was consolidated with McKee's lawsuit. In the consolidated actions, Jones Day sought and obtained summary judgment, and judgment was entered in its favor on August 23, 2002.[3] Estrada waived his right to appeal; McKee abandoned his appeal; and Cuero's appeal was dismissed at his request.

Third, on May 12, 2003, Vega filed this lawsuit against Jones Day and Transmedia, and Jones Day demurred.[4] The demurrer to the fraud claim was sustained, without leave to amend, on multiple grounds, as follows:

— The claim did not allege an actionable, affirmative misstatement by Jones Day;

— Vega could not justifiably have relied on the statements allegedly made by Jones Day;

— Because Jones Day owed Vega no duty to disclose, Vega could not state a claim based on omission or nondisclosure;

---

[3] The complaint in McKee's lawsuit, unlike Vega's complaint, did not allege that Jones Day prepared a complete disclosure of the $10 million financing, but provided Heller Ehrman with a sanitized version of the disclosure schedule without the toxic stock provisions. The trial court in the McKee case (Judge James C. Chalfant) concluded that: (1) Jones Day's statements that the preferred stock offering was "no big deal" and "standard" were nonactionable expressions of opinion. Because Jones Day's loyalty was owed only to Transmedia, not to Monsterbook's shareholders, Jones Day had no duty to disclose the details of the transaction. The statement was also nonactionable because of its casual nature, so that it could not be relied on by anyone. (2) The consent form prepared by Jones Day and signed by Transmedia and McKee was not a representation by Jones Day; and there was no evidence that the consent form—concerning the aggregate maximum of 6,815,000 shares—was a misrepresentation or a misleading half-truth. Therefore, Jones Day had no duty to disclose other terms of the preferred stock transaction. (3) McKee and the other shareholders could not have justifiably relied on Jones Day's opinions; any reliance on Jones Day's opinion that the transaction was "standard" or "no big deal" would have been unreasonable as a matter of law.

[4] Transmedia's default was entered on October 2, 2003.

— Vega did not allege damages proximately caused by Jones Day;

— Vega had no standing to bring the claim because it was derivative in nature;

— The claim was barred by the statute of limitations; and

— The claim was barred by res judicata.

Jones Day's demurrer to the negligent misrepresentation claim was sustained on the same grounds and, in addition, because a negligent misrepresentation claim cannot be based on an omission or nondisclosure. The court also concluded Vega failed to plead both causes of action with the requisite specificity.

The trial court's order sustaining the demurrers and dismissing Vega's complaint with prejudice was filed August 5, 2003, and this appeal followed.[5]

## DISCUSSION

Vega's allegations may be summarized as follows. Jones Day hid the existence of the "toxic" stock provisions with the intent to induce Vega to give up his valuable stock in Monsterbook in exchange for Transmedia's "toxic" and worthless stock. Jones Day knew about the "toxic" stock provisions, and knew the acquisition would not occur if Monsterbook, Vega and their lawyers discovered them. Jones Day deliberately concealed the "toxic" stock provisions by telling Heller Ehrman the transaction was "standard" and "nothing unusual," by failing to provide the proper written disclosure it prepared, and by instead providing a different, sanitized version of the disclosure. Vega did not know, and had no reason to suspect, that the financing contained "toxic" provisions, and would not have given up his valuable stock in Monsterbook had he known. As a result of Jones Day's concealment of the "toxic" terms of the financing, Vega lost his $3.45 million interest in Monsterbook.

---

[5] The trial court's order dismissed Vega's complaint with prejudice, but no judgment was entered for Jones Day in accordance with the order. Since the case is fully briefed, in the interests of judicial economy we will construe the order as a judgment of dismissal. (See *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 3, fn. 1 [115 Cal.Rptr.2d 455] [premature appeal from order sustaining demurrer and granting motion to dismiss; "[a]lthough we fail to understand why the clearly established law on this point continues to be disregarded, in the interest of judicial economy, we shall deem the order to incorporate a judgment of dismissal"].)

We agree with Vega that the complaint properly states a fraud claim.

■   Before we analyze the elements of the claim, we note the governing legal principles. A fraud claim against a lawyer is no different from a fraud claim against anyone else. " 'If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability.' " (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 69 [131 Cal.Rptr.2d 777] (*Shafer*), quoting *Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 345 [258 Cal.Rptr. 454].) While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud. (*Ibid.*) Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient (*Shafer, supra,* 107 Cal.App.4th at p. 69), and may be liable to a nonclient for fraudulent statements made during business negotiations. (*Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 202 [227 Cal.Rptr. 887] ["the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length"].)

With these principles in mind, we turn to the elements of fraud, which are: "(1) representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage (causation)." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 668, p. 123.) Active concealment or suppression of facts by a nonfiduciary "is the equivalent of a false representation, i.e., actual fraud." (*Id.*, § 678, p. 136, italics omitted.) We treat the various elements, and the bases for the trial court's decision, in turn.

### 1. *False representation.*

■   We agree with Jones Day that a mere statement that the $10 million financing then being negotiated was "standard" and "nothing unusual" is not itself an actionable misrepresentation. While expressions of professional opinion are sometimes treated as representations of fact, a "casual expression of belief" is not similarly treated. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408 [11 Cal.Rptr.2d 51, 834 P.2d 745], quoting *Gagne v. Bertran* (1954) 43 Cal.2d 481, 489 [275 P.2d 15].) Moreover, no party to a major transaction could reasonably rely on a casual statement by counsel for another party to the transaction.[6]

---

[6] The demurrer to Vega's cause of action for negligent misrepresentation was properly sustained by the trial court, since such a claim requires a positive assertion. (*Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 306 [18 Cal.Rptr.2d 779] [negligent misrepresentation is a species of fraud requiring a positive assertion; an implied assertion or representation is not enough].) Since no positive assertions are alleged, other than the

■  More problematic, however, is the question of active concealment or suppression of facts, which is the equivalent of a false representation. Vega alleges that Jones Day, after telling Heller Ehrman that Transmedia was about to close a $10 million private stock transaction which it wanted to include in its disclosure schedules, prepared a proper disclosure schedule containing the pertinent terms, but provided a "different sanitized version" of the schedule, without the "toxic" stock provisions. Thus, Vega alleges that Jones Day "deliberately or with a reckless disregard of the truth concealed the 'toxic' stock provisions" from Vega, Monsterbook and Heller Ehrman. These allegations state an "active concealment or suppression of facts."[7] (5 Witkin, Cal. Procedure, *supra*, § 678, p. 136, italics omitted.) So long as the remaining elements of a fraud claim are met (see discussion *post*), we are unable to conclude these allegations are deficient.

■  Jones Day contends that fraud based on concealment requires that the defendant have a duty to disclose the suppressed fact, and that as counsel for the adverse party in a merger, Jones Day owed no duty to disclose to Vega or Monsterbook the terms of the third party $10 million investment. Thus, the disclosure schedule, they contend, "is entirely irrelevant" because Jones Day had no duty to provide it to Monsterbook or Vega or Heller Ehrman. We disagree. Jones Day specifically undertook to disclose the transaction and, having done so, is not at liberty to conceal a material term. Even where no duty to disclose would otherwise exist, "where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." (*Cicone v. URS Corp., supra,* 183 Cal.App.3d at p. 201; *Shafer, supra,* 107 Cal.App.4th at p. 72.)

Jones Day insists this case is controlled by *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823 [64 Cal.Rptr.2d 335] (*B.L.M.*), and that *B.L.M.* held that defendant attorneys owed no duty of care to the adverse party when they provided an opinion on a material aspect of the transaction at issue. Jones Day misconstrues *B.L.M.*, a case with which we have no quarrel. The defendant lawyers in *B.L.M.* specifically stated an opinion on a material point in the transaction on which third party B.L.M. relied. The court concluded that "it would be inappropriate to hold an attorney liable to a third party for a legal opinion which the third party could not, under the Rules of Professional

---

comments that the financing was "standard" and "nothing unusual," no claim for negligent misrepresentation is stated.

[7] See Civil Code sections 1710, subdivision 3 (defining deceit as including "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"), and 1572, subdivision 3 (defining actual fraud in a contract setting to include the "suppression of that which is true, by one having knowledge or belief of the fact").

Conduct, have contracted to obtain from that attorney." (*B.L.M., supra,* 55 Cal.App.4th at p. 839.) The court therefore held that B.L.M.'s reliance on the legal opinion of another party's lawyers "was not justifiable under the facts alleged . . . ." (*Ibid.*) The court specifically stated: "We do not suggest that an attorney should be exempt from liability for negligent misrepresentation under circumstances in which a nonattorney could be held liable; we merely decline to extend professional liability under a negligent misrepresentation theory to individuals who are not clients of the attorney." (*Ibid.,* fn. omitted.)

*B.L.M.* is entirely inapposite. First, plaintiff B.L.M.'s claims were grounded solely in professional negligence—not fraud. On appeal, B.L.M. argued it should be permitted to proceed against the attorneys under a theory of negligent misrepresentation—not fraud. The court reviewed that contention, and ultimately concluded B.L.M. failed to sufficiently allege that the lawyers had the intent to induce B.L.M.'s reliance on their representations, or that the reliance of B.L.M. was justifiable "under the circumstances of the case." (*B.L.M., supra,* 55 Cal.App.4th at p. 835.) Second, as the court in *B.L.M.* pointed out, third parties may recover against an attorney under a negligent misrepresentation theory, in cases involving misrepresentations of fact rather than legal opinions. (*Id.* at pp. 839–840.) The case under review involves the lawyers' alleged concealment of a material fact in a transaction the lawyers undertook to disclose—not the expression of an inaccurate legal opinion as in *B.L.M.* Consequently, Jones Day can take no comfort from *B.L.M.,* which is in no way inconsistent with our conclusion here. Certainly Jones Day had no professional duty of care to Vega as an adverse party in the merger transaction. However, as in *Shafer,* Jones Day did have the same duty others have " 'not to defraud another, even if that other is an attorney negotiating at arm's length.' " (*Shafer, supra,* 107 Cal.App.4th at p. 71, quoting *Cicone v. URS Corp., supra,* 183 Cal.App.3d at p. 202.)

Jones Day contends that *Shafer* is irrelevant, and suggests the result there was due to "the peculiar circumstances." In *Shafer,* the court held that an attorney, who was retained by an insurance company to provide coverage advice in a lawsuit against its insured, could be held liable to the plaintiffs in that lawsuit for making a fraudulent statement about coverage. (*Shafer, supra,* 107 Cal.App.4th at p. 59.) This case is different, Jones Day says, because Vega has not alleged an affirmative misstatement of fact made to him by Jones Day, and because Vega cannot allege any "special circumstances that would give rise to an independent duty of disclosure owed by Jones Day to him."[8] Neither of these asserted differences assists Jones Day. First, *Shafer*

---

[8] In *Shafer, supra,* 107 Cal.App.4th 54, the Shafers recovered a judgment against an insured, and asked the insurer to satisfy the judgment. The insurer's lawyer told the Shafers that the insurer had not agreed to provide indemnity for willful acts, while in fact, as the lawyer well knew, the insurer had agreed to such indemnification; the lawyer made the false statement to

indeed involved an affirmative false statement, while this case involves the concealment or suppression of material facts. However, we can deduce no reason why a lawyer may be liable for one form of fraud but not the other. (See *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 97 [111 Cal.Rptr.2d 711] [it is established by statute " 'that intentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation,' " quoting *Stevens v. Superior Court* (1986) 180 Cal.App.3d 605, 608 [225 Cal.Rptr. 624]]; 5 Witkin, Cal. Procedure, *supra*, § 678, p. 136 [active concealment or suppression of facts is the equivalent of a false representation].) Second, Jones Day's invocation of the principle that fraud based on nondisclosure requires an "independent duty of disclosure" is erroneous. In some but not all circumstances, an independent duty to disclose is required; active concealment may exist where a party "[w]hile under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or suppresses facts which materially qualify those stated."[9] (BAJI No. 12.37; *Cicone v. URS Corp., supra,* 183 Cal.App.3d at p. 201 ["[o]ne who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud"].) Providing a disclosure schedule which deliberately omitted material facts seems clearly to fit this category.

## 2. *Justifiable reliance.*

Jones Day argues that publicly available information cannot form the basis for a concealment claim, and Vega, with reasonable diligence, could have known about the "toxic" stock provisions. Jones Day points out that Vega had notice, in the consent form he signed, that a "Certificate of Designation" regarding the $10 million investment and its terms would be filed with the

---

induce the Shafers to forgo full payment on the judgment. (*Shafer, supra,* 107 Cal.App.4th at p. 66.) The court observed that the lawyer "owed the Shafers a duty not to make fraudulent statements about the insurance coverage provided by [the insurer]." (*Id.* at p. 67.) Jones Day says that in *Shafer*, the applicable provisions of the insurance code gave rise to a "special relationship" and "independent duties" to the plaintiffs since they were third party beneficiaries of the insurance contract. However, *Shafer* nowhere requires, or suggests the need for, a "special relationship" as a predicate to a fraud claim against a lawyer. Indeed, while the facts in *Shafer* are different, the principle it applied was not new. *Shafer* refers to sources citing cases from 28 states holding that an attorney can be liable to a nonclient, even an adversary in litigation, for fraud or deceit. (*Shafer, supra,* 107 Cal.App.4th at p. 75.)

[9] See also *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 398 [102 Cal.Rptr.2d 125] ("[t]his is not a situation where we are required to apply the rule that a 'duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure . . . .' [Citation.] This is because of the principle that 'where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated' "), quoting *Cicone v. URS Corp., supra,* 183 Cal.App.3d at page 201.

Delaware Secretary of State at some time in the future, and that this certificate, containing all the financing terms, was in fact filed two weeks before the merger closed.[10]

■ Jones Day's argument fails on two counts. First, the contention that publicly available information cannot form the basis for a concealment claim is mistaken. The mere fact that information exists somewhere in the public domain is by no means conclusive. (See, e.g., *Seeger v. Odell* (1941) 18 Cal.2d 409, 414–415 [115 P.2d 977] [a plaintiff is not barred by constructive notice of a public record which would reveal the true facts].) Second, the question in a nondisclosure case is whether the defendant knows of material facts, and also knows that those facts are neither known nor readily accessible to the plaintiff.[11] (See BAJI, No. 12.36, ¶ 4.) In this case, Jones Day knew about the "toxic" provisions of the financing, and knew those facts were unknown to Vega unless, and only to the extent that, Jones Day and/or Transmedia disclosed those terms. Indeed, the point of disclosing material information in a transaction is that it is not otherwise available to the other side. Jones Day stated its desire to disclose the $10 million financing transaction, and then allegedly provided a sanitized disclosure, without the "toxic" terms. Questions as to whether Jones Day intentionally concealed that information in order to induce Vega to believe the transaction was "standard," and whether the consent form indicating that a certificate regarding the investment and its terms would be filed in Delaware in the future made the "toxic" terms reasonably accessible to Vega, are questions of fact to be resolved on the evidence, not as a matter of law on a demurrer.

### 3. *Reliance and causation.*

■ Jones Day argues Vega cannot establish that nondisclosure of the "toxic" terms of the $10 million third party financing resulted in any damage. This is because (1) Vega agreed to exchange his Monsterbook stock for Transmedia stock on March 8, 2000, before the third party financing transaction arose and before he consented to it, and (2) Vega "concedes" in his complaint that

---

[10] While both parties refer to the consent form, it is not a part of the record in this case.

[11] Jones Day cites several cases in connection with its statement that Vega could have discovered, with reasonable diligence, the "toxic" provisions of the financing. These cases reject fraudulent concealment claims where the information in question was readily accessible, or plaintiff was on inquiry notice of the allegedly concealed information. (E.g., *Stevenson v. Baum* (1998) 65 Cal.App.4th 159 [75 Cal.Rptr.2d 904] [affirming summary judgment; the plaintiffs could not state cause of action for fraudulent nondisclosure of a pipeline easement as a matter of law, because the purchase contract put the plaintiffs on notice that they took title subject to easements of record]; *Clayton v. Landsing Pacific Fund, Inc.* (N.D.Cal. May 16, 2002) 2002 U.S. Dist. LEXIS 9446 [no claim for fraudulent concealment of the decline in value of the plaintiff's investment, where value of shares was publicly available, and in addition letter from the defendants actually disclosed the decrease in the value of the plaintiff's investment].)

Transmedia "would have gone out of business" without the $10 million investment. This claim is puzzling at best. First, while Vega agreed to exchange his stock on March 8, he may have had good grounds to rescind the agreement if the "toxic" terms of the financing had been disclosed. This is not a point that can be determined on a demurrer. Second, Jones Day quotes only part of the sentence in which Vega "concedes" Transmedia would have gone out of business without the financing. The complaint alleges that disclosure of the "toxic" terms of the financing "would have killed the acquisition," and that "[w]ithout the acquisition," Transmedia would not have obtained the financing and would have gone out of business. We fail to see how these allegations show Vega was not harmed by the failure to disclose the "toxic" terms of the financing. Quite the contrary. Vega alleges that had full disclosure been made, he would not have exchanged his valuable Monsterbook stock for the "toxic" Transmedia stock. Those allegations, if true, show the nondisclosure resulted in damage.

### 4. *Requisite particularity.*

■ The trial court also sustained the demurrer on the ground Vega failed to allege the cause of action "with the requisite degree of specificity." Jones Day argues Vega has not alleged "(1) who, (2) said what, (3) to whom, (4) when, and (5) in what manner," and waived the opportunity to replead.[12] Again we disagree. The pertinent question in a concealment case is not who said what to whom; the question, among others, is whether Jones Day, in undertaking to disclose the $10 million financing, intentionally concealed its "toxic" terms from Vega and Monsterbook so that they would proceed with the transaction. The complaint sufficiently apprises Jones Day of the facts of Vega's fraud claim to allow Jones Day to prepare its defense. (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660].)

### 5. *Standing to sue.*

Jones Day contends Vega has no standing to sue Jones Day for fraud because his claims are "derivative" claims. In a tortuous argument, Jones Day concludes that because Vega agreed to accept Transmedia stock before the

---

[12] The trial court stated it was "willing to sustain [the demurrer] without leave to amend and just get this on the short track up to the court of appeal," although its general practice was to "give the other side a chance to amend if they think they can amend to cure the defect in the complaint. [¶] So it is up to you [Vega]." Vega's counsel responded, "Well, if the reason for the demurrer sustaining it without leave to amend is that the court feels that there is somehow a different duty vis-à-vis Jones, Day as there is with Transmedia." The court replied, "Well, that is one of the reasons." Counsel then said, "All right. Then I think it is better to take it up now. I don't want to fight Gibson, Dunn for a year and then be back here."

third party financing transaction arose, the gravamen of his complaint "must be for the diminution in the value of the Transmedia stock" he acquired, which was caused by Transmedia's entering into the private stock transaction. This, Jones Day asserts, is a classic example of a derivative claim because the harm to Vega is the same harm suffered by every other Transmedia or Monsterbook shareholder.

■ Jones Day is mistaken. A derivative suit is a suit brought on behalf of a corporation for injury to the corporation, often for breach of fiduciary duty, mismanagement or other wrongdoing by corporate officers or directors, or for wrongs against the corporation by third parties. (See Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2004) ¶¶ 6:602 & 6:603, pp. 6-128.1 to 6-128.2.) An action is derivative " 'if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' " (*Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106 [81 Cal.Rptr. 592, 460 P.2d 464], citing *Gagnon Co., Inc. v. Nevada Desert Inn, Inc.* (1955) 45 Cal.2d 448, 453 [289 P.2d 466].) This is not such a case. Vega alleges that Jones Day deceived him into exchanging his valuable stock in Monsterbook for worthless stock in Transmedia. As in *Jones*, Vega "does not seek to recover on behalf of the corporation for injury done to the corporation" by Jones Day. (*Jones v. H.F. Ahmanson & Co., supra,* 1 Cal.3d at p. 107.) Instead, "the gravamen of [his] cause of action is injury to [himself] . . . ." (*Ibid.*)[13]

---

[13] Jones Day relies on *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 117, 124 [84 Cal.Rptr.2d 753], which held that the plaintiff—the minority shareholder in a two-shareholder corporation—had no standing as an individual to bring an action for breach of fiduciary duty against the majority shareholder. The plaintiff had no standing as an individual because the obligations allegedly violated—which amounted to negligence and misfeasance in managing the corporation's business—were "duties owed directly and immediately to the corporation." (*Id.* at p. 125.) In this case, by contrast, the "duty"—not to defraud another person—is not a duty owed only to the corporation. Indeed, *Nelson* expressly states that "the same facts regarding injury to the corporation may underlie a personal cause of action, such as . . . fraud . . . [but] Nelson has not alleged or proved the elements" of a fraud cause of action. (*Id.* at pp. 124–125 & fn. 6.)

### 6. *Statute of limitations.*

Jones Day argues that Vega's fraud claim is barred by the three-year statute of limitations.[14] Again, we disagree.

Vega alleged he first discovered the "toxic" terms of the $10 million financing transaction on December 14, 2000, when a Transmedia press release revealed that the terms of the financing had included a "toxic" stock provision. He filed suit on May 12, 2003. Jones Day argues the three-year statute expired no later than March 28, 2003, three years after the filing in Delaware of the "Certificate of Designation" containing all the terms of the transaction. Jones Day recognizes that the statute of limitations in a fraud action does not begin to run "until the discovery, by the aggrieved party, of the facts constituting the fraud . . . ." (Code Civ. Proc., § 338, subd. (d).) However, it argues Vega should have discovered the "toxic" terms of the financing on March 28, 2000, since the filing of the certificate in Delaware put him on inquiry notice.

The rule is that the statute commences to run "only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 [159 P.2d 958].) The means of knowledge are equivalent to knowledge "only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious."[15] (*Hobart v. Hobart Estate Co., supra,* 26 Cal.2d at p. 438.) We cannot say, as a matter of law, that Vega's knowledge that the $10 million financing transaction would occur, standing alone, should have made him "suspicious of fraud," or suspicious that the transaction might contain "toxic" terms. Whether other circumstances exist which, in conjunction with knowledge of the existence of the financing transaction, would have made a prudent person suspicious is a question that cannot be resolved on demurrer.

### 7. *Res judicata.*

Finally, Jones Day contends that Vega's claims are barred by the doctrine of res judicata, because Jones Day obtained summary judgment in its favor

---

[14] Since Vega's negligent misrepresentation claim has been disposed of on other grounds (see fn. 6, *ante*), we need not consider whether it is governed by and barred by a shorter statute of limitations.

[15] " 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' " (*Hobart v. Hobart Estate Co., supra,* 26 Cal.2d at p. 438, quoting *Tarke v. Bingham* (1898) 123 Cal. 163, 166 [55 P. 759], italics omitted.)

on fraud claims in earlier lawsuits brought by three other shareholders, who subsequently waived, abandoned and dismissed their respective appeals. Jones Day argues Vega was in privity with each of those three shareholders, because he is also a former shareholder in Monsterbook, his fraud claim is the same as their claims, he knew about their lawsuits, and he is using the same attorney. This relationship, Jones Day contends, is sufficiently close to justify application of the principle of preclusion. Again, we cannot agree.

The doctrine of res judicata precludes parties or their privies from relitigating issues decided in a prior action in which a final judgment on the merits was entered. While Jones Day obtained summary judgment on fraud claims by three other shareholders, Vega was not a party to those lawsuits. The concept of privity has been expanded to include "a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel." (*Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].) However, "[n]otwithstanding expanded notions of privity," due process requirements must be satisfied. (*Ibid.*) The cases uniformly state that, in addition to an identity or community of interest between the party to be estopped and the losing party in the first action, and adequate representation by the latter, "the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." (*Clemmer v. Hartford Ins. Co., supra,* 22 Cal.3d at p. 875.)

We discern no basis for concluding Vega "should reasonably have expected to be bound by" the adjudication of lawsuits in which he did not participate in any way, in which he had no proprietary or financial interest, and over which he had no control of any sort. (See *Lynch v. Glass* (1975) 44 Cal.App.3d 943, 949 [119 Cal.Rptr. 139] ["it cannot be said that appellants should reasonably have expected to be bound by the prior adjudication"; although appellants "were fully aware of the prior litigation, the appearance of one of them as a witness gave them no power to control any aspect of the case"]; *Aronow v. LaCroix* (1990) 219 Cal.App.3d 1039, 1052 [268 Cal.Rptr. 866] [where plaintiff was litigant, attorney and witness at various stages of prior case, but did not participate throughout, her connection with prior case "though falling short of the power to control, was so close that she should reasonably expect to be bound by the result"].) The only relationship between Vega and the prior lawsuit is that he and the plaintiffs in those suits were shareholders in the same company. We are aware of no precedent for finding this to be a "sufficiently close" relationship to justify application of the principle of preclusion, and we decline to create one.

## DISPOSITION

The order dismissing the complaint, construed as a judgment of dismissal, is reversed and the cause is remanded for further proceedings. Appellant is entitled to recover his costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied August 30, 2004, and respondent's petition for review by the Supreme Court was denied October 27, 2004. Chin, J., was of the opinion that the petition should be granted.