Filed 3/8/16  Wells Fargo Bank v. Prime Partners Medical Group CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| WELLS FARGO BANK, N.A., | D069061 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIC1102303) |
| PRIME PARTNERS MEDICAL GROUP, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside County, Daniel A. Ottolia, Judge.  Affirmed.

Law Office of Norma Ann Dawson and Norma Ann Dawson for Defendants and Appellants.

Fabozzi & Miller, Edward J. Miller and Kitty A. Baker for Plaintiff and Respondent.

This action for damages on fraud and other theories arose out of a business loan made by plaintiff Wells Fargo Bank, N.A. (the Bank), to defendants Prime Partners

Medical Group, Inc. (PPMG), its owner and guarantor Donald Woo Lee, M.D. (Dr. Lee), and his wife Linda B. Lee (sometimes together Defendants). After PPMG defaulted on the $1.4 million loan, which was obtained to finance the acquisition and installation of medical equipment, the Bank sued Defendants, alleging their loan application documents contained multiple misrepresentations on which the Bank relied in funding the loan to its detriment.

After a court trial, multiple causes of action were resolved against Defendants. As relevant here, the trial court issued a statement of decision and judgment finding in favor of the Bank and against Defendants on fraud and awarding it damages in the principal amount of $1,153,601.09, plus past due interest, attorney fees and costs. One hundred fifty thousand dollars in punitive damages was awarded against Dr. Lee. Defendants challenge only the fraud portion of the judgment, arguing that the documents they supplied in support of the loan application (mainly a lease showing where the medical equipment would be housed and invoices indicating their proposed purchase prices) were not materially misleading, even if they were inaccurate. They contend the Bank's evidence of any intent to defraud "is mere speculation and conjecture," and "[t]he totality of evidence establishes that [Defendants] believed they had complied with the terms of the loan."

Further, Defendants argue on appeal the Bank did not meet its burden of proof to show its justifiable reliance and/or causation of loss but, instead, the evidence only supports findings that the Bank's representatives did not act in the manner of reasonable business persons when relying on Defendants' documents to fund the loan. For this

2

alleged lack of supporting evidence, Defendants seek reversal of the judgment's compensatory and punitive damages for fraud.

Utilizing the appropriate standards of review for a judgment after trial where conflicting evidence was presented and factual findings were made in a statement of decision, we find no error and affirm the judgment. (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 (*Hoffmeister*).)

I

*FACTUAL AND PROCEDURAL BACKGROUND*

A.  Loan Transactions

The transactional facts will be outlined in more detail as necessary in the discussion portion of this opinion.  In brief, evidence was presented at trial showing that Defendants utilized several corporate entities, some of them owned by their former codefendant Sammy Ciling (Ciling), who was Dr. Lee's partner and agent, to facilitate PPMG's acquisition of two used MRI machines.  Ciling's business enterprises included servicing and installing such equipment.  Although those other Ciling-Lee corporate entities named in the transaction were formerly named as defendants in this action, they were all dismissed.[1]  The trial court entered a fraud judgment against Ciling as well and,

---

[1]  Defendants explain in their reply brief that the purchase processes went as follows: Barrington United Corp. (Barrington), a company owned by Ciling, "brokered" the two machines to S&A Operations, Inc. (S&A Operations), a trucking company owned by their acquaintance, Alan Rizzone (both S&A Operations and Rizzone were dismissed defendants).  S&A Operations then brokered it to PPMG, which took possession, even though the state of title is not entirely clear from the record.  Formerly, Dr. Lee and

although he filed a separate notice of appeal, he abandoned it and the remittitur has issued as to Ciling only.

The equipment purchase was financed by the Bank, which received Dr. Lee's three versions of applications for the loan, variously specifying that the loan proceeds would be used for working capital, equipment purchases, or business expansion. Testimony from two Bank witnesses, Lori Quizon, an underwriter and Rachel Petrella, a loan adjuster from the credit management group, outlined the several months' long procedure used in processing the loan. In August 2009, Dr. Lee consulted a Bank business development officer who prepared a Small Business Administration (SBA) loan package and sent it to the Bank's underwriters. They supplied an October 21, 2009, loan commitment letter, specifying the loan was being issued "[t]o assist with the acquisition of MRI and CT equipment as part of the expansion of [Defendants' businesses]." The SBA fees were to be waived pursuant to federal legislation if the loan closed before the end of the year. Originally, a company owned by Dr. Lee and Ciling was to be the borrower, but the Bank required that it be removed from the loan, and Ciling was dropped as having any activity in the loan. (See fn. 1, *ante*.)

Pursuant to the loan commitment letter, Defendants were required to provide approximately 20 supporting documents, including invoices from the vendors and a lease for the office where the equipment would be located. Payment by the Bank was to be made directly to the vendors upon receipt of the invoices. The letter also specified that

Ciling co-owned Temecula Diagnostics, Inc., a company that was also a dismissed defendant.

4

the collateral would include a security interest in the borrowers' equipment, inventory, accounts, etc., as well as deeds of trust on two real properties owned by Dr. and Mrs. Lee. A commercial security agreement and a U.C.C.-1 financing statement were prepared to document security interests in the equipment collateral, utilizing a leased address supplied by Defendants on Enterprise Circle North in Temecula. Dr. Lee was required to make a continuing guarantee.

In a separate transaction, Ciling's company Barrington had incurred a $30,000 debt to S&A Operations for trucking services. Ciling was assisting Dr. Lee in preparing the supporting documentation required by the loan commitment letter. At Ciling's request on behalf of Dr. Lee, S&A Operations created two invoices dated December 28, 2009, and January 13, 2010, according to specifications supplied by Ciling. The invoices showed that for each of the MRI machines, the purchase price for PPMG was to be $700,000, and the machines were to be shipped by S&A Operations to PPMG at an Enterprise Circle North address. The invoices also recited, "Price includes de-installation, re-installation and 3 year warranty for parts and labor." Defendants submitted those two invoices to Bank officers on December 30, 2009 and January 14, 2010.

Defendants also submitted a lease executed on December 3, 2009, for PPMG to begin a 10-year rental term on January 1, 2010, for office property on Enterprise Circle North. The lessor was Snowtime Holdings, Inc., a business entity owned by Ciling. The lengthy lease form contained some inconsistent or questionable information about the applicability of New Mexico or Florida law. Earlier in 2009, Ciling and Dr. Lee paid for tenant improvements for that property. However, in July 2009, Ciling lost possession and

5

ownership of it through another bank's foreclosure. Dr. Lee testified that he did not learn about that until January 2010.

After the Bank's underwriting department processed the loan during the fall of 2009, it sent the package to the closing department, which returned it to the development officer for provision of required documentation and for signatures. In her testimony, the Bank's loan adjuster explained that the loan processing was accelerated somewhat so that the borrowers could qualify for an SBA fee waiver benefit that was due to terminate at the end of December. The loan was approved December 24, 2009. On receipt of the invoices and on behalf of PPMG, the Bank wired $700,000 for each piece of equipment to S&A Operations, beginning on December 28, 2009.

As Rizzone had agreed, once S&A Operations received the $1.4 million, it transmitted the money to Ciling's company Barrington after deducting $30,000 that Barrington owed to S&A Operations on the other set of services. As shown on other invoices dated January 11 and 12, 2010, Barrington as the buyer went forward with the purchase of two used MRI machines for the respective prices of $275,000 and $185,000. Since the Enterprise Circle North location was unavailable, Dr. Lee and Ciling leased other locations in Fallbrook and Lake Elsinore for placement of the equipment, operating through a new company they formed (My Imaging Center, Inc.).

In his testimony, Dr. Lee represented that he told another Bank employee, Andrew Moreno, about the alternate addresses where the equipment was located. Dr. Lee also told Moreno that although the original plan with the Bank had been to purchase new

6

equipment, Dr. Lee later decided that obtaining used equipment with the loan proceeds would be more cost effective. Moreno did not testify at trial.

In May 2010, Ciling submitted another invoice to S&A Operations for its approval, including somewhat more detail about what the stated $650,000 price would include ("Warranty for 3 years parts and service" [not "labor" as in the previous invoices]). Rizzone rejected the invoice and requested that Ciling tell the Bank and Dr. Lee that S&A Operations had no knowledge of the transaction.

After making payments for about 10 months, Defendants went into default on the loan and the Bank sent a notice of default in November 2010. Defendants submitted other payments but the Bank refused to accept them and brought this action.

### B. Other Causes of Action Resolved; Statement of Decision on Fraud

The operative first amended complaint was filed in July 2011, alleging eight causes of action. Among other things, the Bank asserted that another company had a senior lien position on the equipment, and the Bank's security interest was valueless. The Bank ascertained through discovery that the used equipment had cost about $460,000, and the balance of the loan proceeds was distributed among S&A Operations, Defendants and their other companies, all before the default in payments occurred.

During trial, the Bank dismissed three of its causes of action, as well as dismissing the defendants S&A Operations and Rizzone. Judicial notice was taken as requested of the relevant real property deeds (collateral for the loan) and the recorded UCC-1 financing statement. (Evid. Code, § 452.) Following testimony, the court resolved the remaining causes of action by granting a motion for directed verdict and judicially

foreclosing on the two collateral real properties. Judgment for the Bank was therefore granted on the causes of action for the personal guarantee, breach of contract of the business line of credit, and the business line guarantee. The court took the fraud cause of action under submission.

As relevant to the fraud claim, the Bank presented witnesses including Rizzone's account of his participation in the transactions, to accommodate Ciling's request and to recover the $30,000 owed to him by Ciling. Rizzone's business was mainly a trucking and trailer company and he was not otherwise involved with selling medical equipment. The court heard testimony from the Bank's underwriter and loan adjuster. Both Dr. Lee and Ciling testified as adverse witnesses, and Dr. Lee testified on behalf of the defense case. (Evid. Code, § 776.)

On July 19, 2013, the court issued its statement of decision on the fraud claim, finding in favor of the Bank. The court addressed each element of the fraud cause of action, ruling that the invoices and lease contained multiple misrepresentations, Defendants knew the lease and invoices were false, and the Bank had justifiably relied on the representations made to it. Compensatory damages for fraud of $1,153,601.09 were awarded, along with other relief, including $150,000 in punitive damages against Dr. Lee. Defendants filed this appeal.

II

*RULES OF REVIEW*

Defendants initially argue that a de novo standard of review applies, but then modify their position to state that mixed questions of law and fact are presented. They

8

appear to argue that only legal questions are presented on a given set of facts, many of them involving documentary evidence. (See, e.g., *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [application of law to undisputed facts is subject to de novo review].)

However, Defendants also acknowledge the applicability of the usual standard of review for a judgment based on the trial court's statement of decision. Where, as here, conflicting evidence was presented on issues of documentary interpretation and the intent of the parties, and the issues were resolved in a statement of decision, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*Hoffmeister, supra,* 191 Cal.App.3d at p. 358.) The ultimate facts found in the court's statement of decision necessarily include findings on the intermediate evidentiary facts that sustain them. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.)

In a fraud case, "[a] misrepresentation need not be oral; it may be implied by conduct." (*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567; see *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 151 [misrepresentation need not be express but may be implied from the circumstances].) The trial court was entitled to draw inferences from the evidence about the nature and effect of the representations made by Defendants during the lending process, as well as their concealments of information and whether those operated to materially alter the conduct of the Bank in conducting its business.

9

Because of the credibility issues involved at trial, under substantial evidence principles, " ' "every intendment and presumption not contradicted by or inconsistent with the record on appeal must be indulged in favor of the orders and judgments of superior courts." ' " (*Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1250, quoting *Walling v. Kimball* (1941) 17 Cal.2d 364, 373.) "If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

"[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid.*; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.)

As appellants, Defendants have a duty to support their arguments by references to the record on appeal, including citations to specific pages in the record. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 (*Duarte*).) "Failure to set forth the material evidence on an issue waives a claim of insufficiency of the evidence." (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96.) If an argument is not supported with necessary

10

citations to the record on appeal, that portion of the brief may be stricken and/or the argument may be deemed waived. (*Duarte*, at p. 856.) Defendants' briefs have presented an incomplete statement of facts, omitting references to evidence unfavorable to them, and they do not provide appropriate support for their arguments that the judgment was rendered in error.[2] In any event, we reach the merits by setting forth the legal principles relevant to the claim of fraud and examining the pertinent evidence for its sufficiency in supporting the judgment for damages.

III

*REQUIREMENTS FOR PROVING FRAUD; ISSUES PRESENTED*

The basic elements of fraud are (1) a representation, taking the form of a false representation, concealment, or nondisclosure; (2) knowledge of falsity; (3) intent to defraud and induce reliance; (4) justifiable reliance; and (5) resulting damage (causation). (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 (*Alliance Mortgage Co.*).) Civil Code section 1572 defines actual fraud in the contract context as proof of a party's intentionally deceptive acts, done as inducement to enter into a contract in any of the following ways: "(1) The suggestion, as a fact, of that which is not true, by one who

---

[2] Although the opening brief refers to both the compensatory and punitive damages awards as unsupported by the record, Defendants did not make any specific arguments about the appropriateness of the punitive damage award until their reply brief. (See, e.g., *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 ["grossly excessive punishment" of a tortfeasor is constitutionally prohibited].) To the extent this argument is properly before us, despite the lack of adequate briefing, the record does not disclose that the award is disproportionate. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [failure to discuss issue in briefs forfeits issue on appeal]; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 118 [party waived appellate issue not raised in opening brief and not adequately supported in reply brief].)

11

does not believe it to be true; [¶] (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] (3) The suppression of that which is true, by one having knowledge or belief of the fact; [¶] (4) A promise made without any intention of performing it; or, [¶] (5) Any other act fitted to deceive."

The initial issue presented is whether the affirmative representations made by Defendants were materially misleading. Information is considered material if " 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' [citations], and as such materiality is generally a question of fact unless the '[information] is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977.)

Conversely, we examine the record to determine whether the Bank sufficiently showed that the concealments of other relevant information known to Defendants materially affected the decisions being made by the Bank. "Mere nondisclosure is ordinarily not actionable unless the defendant is a fiduciary with a duty to disclose, but active concealment or suppression of facts [citation] is the equivalent of a false representation, i.e., actual fraud." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 722, p. 138; Civ. Code, § 1572, subd. (3) [suppression of fact "by one having knowledge or belief of the fact" may be fraudulent].)

Under these definitions, Defendants cannot now claim that they did not come under a duty to disclose additional information known to them about the components of

12

their loan application simply because they had no fiduciary relationship with the Bank. Instead, it is well established that a plaintiff can demonstrate fraudulent nondisclosure by the defendant if the facts that were withheld would have materially affected the value or desirability of the property or the transaction, and such facts were known to the defendant, who also knew that the facts were "unknown to or beyond the reach of the plaintiff." (*La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1151-1152 [additional fraud elements include defendant's intent to induce plaintiff's action, inducement to act and resulting damage].)

The evidence at trial thus addressed not only the Bank's intentional fraud arguments but also whether the disclosures Defendants made were so incomplete and defective as to amount to fraudulent nondisclosure. In such a case, the duty of disclosure is treated as "fact dependent and a question for the trier of fact, not a question of law." (*Marketing West, Inc. v. Sanyo Fisher* (*USA*) *Corp.* (1992) 6 Cal.App.4th 603, 614; see also *Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 312, fn. 9 [existence of duty to disclose was "for the jury to sort out"].)

Likewise, whether Defendants demonstrated an intent to defraud is a factual matter to be examined on appeal for supporting evidence. (*Alliance Mortgage Co., supra*, 10 Cal.4th at p. 1239.) We consider whether sufficient evidence supports the judgment in terms of the Bank's showing that it reasonably relied upon Defendants' presentations in the loan application, including the invoices and lease, and that it suffered loss as a result. (*Ibid.*; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108.)

13

IV

*ANALYSIS*

A.  Contentions

In its statement of decision, the trial court summarized the position taken by Defendants at trial that the amounts borrowed for purchase of the machines were also intended to cover the anticipated costs of servicing the machines, as well as warranty, which in their minds explained why they sought a loan for much more than the eventual purchase prices would have required.  In Defendants' closing trial brief, they also suggested it was not uncommon in the industry for brokers involved in the sales (e.g., S&A Operations) to mark up the price of the equipment, as the Bank should know and, in any event, the Bank had obtained the benefit of its bargain and suffered no loss, in that Dr. Lee now has two pieces of equipment as always anticipated.

On appeal, Defendants further suggest that the evidence did not show they had any intent to defraud but, instead, they always intended to make loan payments as agreed but were prevented from doing so by their other business setbacks.  They claim that the Bank failed to demonstrate justifiable reliance on their documents in support of the loan application for several reasons:  because the loan was approved and funded before all the papers were supplied (invoices and lease), or because some of those papers were defective or suspicious on their faces (poorly drafted lease; overly costly invoice amounts), or because the anticipated purpose of the loan generally included business expansion.  We turn to the record to evaluate whether it lacks support for the judgment, as argued on appeal.

14

B.  Nature of Misrepresentations or Concealments; Fraudulent Intent

The Bank's fraud theory asserts that Defendants fraudulently concealed material facts about the support for their loan application, and made only partial disclosures while concealing harmful information, which the Bank could not have known.  Although Defendants had a duty to provide the information requested in the loan application so that the lender could accurately evaluate the risk it was undertaking, they failed or refused to do so.  The initial issue presented is whether the affirmative representations made by Defendants were materially misleading.  (*Alliance Mortgage Co., supra,* 10 Cal.4th at p. 1239 [knowingly false representation is actionable where intent was to induce reliance, etc.].)  As will be explained, the evidence supports the trial court's conclusion that Defendants' invoices actively and intentionally misrepresented the identity of the buyer of the equipment and the price to be paid for it, and the lease falsely represented where it was to be housed.

Alternatively, the record shows that Defendants concealed material information on all three of these deal points.  "Active concealment or suppression of facts by a nonfiduciary 'is the equivalent of a false representation, i.e., actual fraud.' "  (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 (*Vega*).)  The question in a nondisclosure case "is whether the defendant knows of material facts, and also knows that those facts are neither known nor readily accessible to the plaintiff."  (*Id.* at p. 295; *San Diego Hospice v. County of San Diego* (1995) 31 Cal.App.4th 1048, 1055 (*San Diego Hospice*).)  "A duty to disclose may also arise in the so-called 'half truth' context─that is, when a speaker makes a representation which, though not false, he

15

knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation." (*Ibid.*, fn. 4.) Such a duty to disclose requires some scienter, or knowledge by the defendant "of significant facts the plaintiff needs but does not have." (*Id.* at p. 1055.)

On the identity of the buyer, the evidence showed that the invoices representing the actual transactions were materially different from the proposed invoices submitted to the Bank as to the identity of the purchaser and seller. Defendants misled the Bank into thinking that S&A Operations was the seller, for a given amount, and that PPMG would be the buyer. Eventually, the purchases were made in the name of Barrington, one of Ciling's companies, and from a different set of sellers, and for smaller amounts than originally planned. When Ciling submitted a different copy of the invoice to S&A Operations for its approval in May 2010 (for a $650,000 price and a "Warranty for 3 yrs. parts and service"), Rizzone replied by disassociating himself from further contact. He eventually testified at trial against Defendants' version of his involvement. The record does not support Defendants' contention that S&A Operations was a legitimate medical equipment brokerage firm that merely temporarily took title on PPMG's behalf.

Regarding the prices to be paid according to the original invoices, the Bank was given no clear indication or information that an additional sum was being borrowed for a service contract. The court expressly found that Dr. Lee's testimony was not credible that he had told the Bank that used machines would be purchased for around $200,000 to $300,000, and that the balance of the loan would be for service expenses. Although the invoices referenced "de-installation/re-installation" and a parts and labor warranty, they

16

did not show how Dr. Lee's selected service contractor, Ciling, was going to be compensated or at what monetary level. Although Ciling was apparently qualified to service the equipment, the Bank had declined to treat him or his company as parties to the loan transaction, when the original application was made in the name of a company that he co-owned with Dr. Lee. Defendants materially misled the Bank by attempting to treat Ciling as still included in the deal.

With regard to the location where the equipment was to be housed, the invoices as submitted showed delivery to the "leased" Enterprise Circle North location. Since the Bank required that the equipment be treated as collateral for the loan, it was important to the Bank to be able to locate it in the event of a default. The evidence showed that the lease arrangement shown on the invoices was no longer possible as of the time of submission, because Ciling no longer owned that office property. The lease was executed before the loan closed, giving rise to inferences that Defendants had an intent to defraud the Bank into loaning the money for a stated purpose that was known to be impossible. The trial court was not required to believe Dr. Lee's explanation that he did not learn that Ciling had lost the property until a month later.

Although the eventual purchases were made in the name of Barrington, one of Ciling's companies, both the collateral and security arrangements shown in the record were in the name of the borrower PPMG, potentially interfering with the Bank's security. Because of the discrepancy between the two sets of invoices, it is not persuasive for Defendants to claim, "No evidence was introduced that any one between the original owners of the MRI machines and [PPMG] acquired title to either of the MRI machines.

17

[Defendants] submit this is because no one other than [PPMG] had title to the MRI machines once they were retrieved from the original owners." Defendants do not cite to any evidence to substantiate this factual representation and, instead, the record supports inferences that Defendants had the requisite knowledge of falsity of numerous important representations they made to the Bank.

With respect to Defendants' creative argument that they always intended to pay on the loan regardless of the circumstances under which it was made, they focus on an irrelevant fact. Where a fraud or misrepresentation claim is predicated on a failure to perform contractual obligations, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' " (*Tenzer v. Superscope*, *Inc.* (1985) 39 Cal.3d 18, 30, 31; *Magpali v. Farmers Group, Inc*. (1996) 48 Cal.App.4th 471, 481.) More proof was presented here. From the outset of the transaction, Defendants submitted false and misleading documents in support of their loan application, which demonstrated their intent was to induce the Bank to make a large loan, which it did. Accordingly, the monthly payments were sizable ($15,487.50). Defendants cannot now argue that the only relevant intent for the Bank to prove would have been Defendants' belief that they were going to keep up those payments, since the transaction was otherwise flawed from the outset.

At the very least, the evidence sufficiently demonstrated that Defendants provided documents in support of their application that amounted to " 'half truth[s]' " and they made representations that, even if not entirely false, were materially misleading "absent

18

full disclosure of additional facts known to [them] which qualify the initial representation."  (*San Diego Hospice, supra*, 31 Cal.App.4th at p. 1055, fn. 4.)

## C.  Justifiable Reliance; Causation

Defendants next contend the Bank failed to show it changed its position in justifiable reliance upon their inaccurate and misleading representations, or that it suffered loss or damage.  In *Alliance Mortgage Co.*, the court explained that an assessment of the degree of justifiable reliance is usually a question of fact:  " '[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.' "  (*Alliance Mortgage Co., supra,* 10 Cal.4th at p. 1239.)  "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction."  (*Ibid.*)

" 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, . . . he will be denied recovery,' " and a "hopeful expectation[] cannot be equated to the necessary justifiable reliance."  (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 54-55 (*Kruse*).)  Defendants complain that the Bank was not diligent in investigating the materials they submitted to it and did not act in a reasonable manner in relying on them.  They simply claim that the Bank "did not pay attention to the disclosures set forth in documents [Defendants] gave [Plaintiff] in support of the loan.  [Defendants] did not 'make' Wells Fargo fund the loan.  Any lack of knowledge on its part was its fault."

19

On appeal, our duty is to examine whether the evidence supports the trial court's conclusion that the Bank took the action it did in reasonable reliance on Defendants' misrepresentations or nondisclosures, and they qualified as an immediate cause of the alteration of its legal relations. (*Alliance Mortgage Co.*, *supra*, 10 Cal.4th at pp. 1240, 1239 [e.g., "the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience"].) The court had a sufficient basis to reach that conclusion. This was a business loan to a sophisticated set of borrowers, negotiated over three applications and a period of about four months, supported by Dr. Lee's personal financial disclosures and credentials. The Bank showed some leniency in approving the loan before the end of the year to accommodate the borrowers in obtaining the time sensitive SBA fee waiver, even though not all of the requested supporting documents had yet been submitted. When the documents were submitted, they were inaccurate and misleading, but the Bank had not been put on notice that something other than Defendants' good faith compliance would be forthcoming.

In hindsight, it is easy to say that the Bank could have done a better job in vetting the loan but, in light of the applicable standards, we conclude the trial court had an adequate basis to find the Bank's reliance was justified, based on Defendants' representations they were using the loan proceeds to purchase certain valuable equipment that would be pledged to secure the loan and that would be located as promised. The Bank brought forward sufficient evidence that the loan would not have been made if the true facts were made known to it about the false invoices and the bogus lease.

20

Finally, Defendants attack the Bank's showing of causation by arguing that it actually obtained the benefit of its bargain, more or less.[3] "It is axiomatic that to obtain a recovery for fraud, a claimant must prove, inter alia, that damages were sustained as a proximate cause of the fraudulent conduct. [Citation.] Assuming, arguendo, a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes." (*Kruse*, *supra*, 202 Cal.App.3d at pp. 60, 61.) Defendants thus seem to argue that it was their other business problems that made them unable to pay on the loan. However, that is off the point, because the Bank was entitled to rely on the collateral and security promised to it. Its UCC-1 statement and security agreement turned out to be inaccurate as prepared due to the misleading information submitted to the Bank by Defendants about the value of the equipment and its availability as security.

Alternatively, Defendants blame the Bank for its "misunderstanding of the manner in which medical equipment is transferred from one owner to another," such as through brokerage arrangements. However, these purchasing arrangements were shown to be highly unorthodox and the Bank provided evidence on Rizzone's repudiation of any claim by Defendants that he had been a legitimate broker acting on their behalf.

Further, the defects in the information that Defendants supplied to the Bank were "neither known nor readily accessible to the plaintiff." (*Vega, supra*, 121 Cal.App.4th at

---

3      As the benefit of the bargain measure of damage is defined in *Alliance Mortgage Co.*, *supra*, 10 Cal.4th at page 1240, no recovery will be allowed when there is no difference in value " 'between what the plaintiff actually received and what he was fraudulently led to believe he would receive.' " (*Ibid.*)

21

p. 295.) Defendants cannot legitimately claim either that the Bank had "no excuse for failing to try to recover its security. Did [Plaintiff] ask [Defendants] to surrender the two MRI machines? No evidence was presented that occurred. A contention that [Plaintiff] did not know how to locate [Defendants] would be disingenuous"; or that, "[Defendants] did not hide the two MRI machines from [Plaintiff]." Defendants have not explained why or cited to evidence on how the used equipment apparently purchased by Barrington nevertheless provided sufficient available collateral to satisfy the large amount of the loan, even taking the real property collateral into account. (*Duarte*, *supra*, 72 Cal.App.4th at p. 856 [unsupported arguments may be deemed waived].) The Bank adequately showed causation of its loss.

Without reweighing the evidence, when we accept the substantial evidence in the record "contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts," this reviewing court is entitled to accept the trial court's resolution of the disputed factual and legal issues. (*Bowers*, *supra*, 150 Cal.App.3d at pp. 874, 873.) The evidence sufficiently supports the judgment for damages.

DISPOSITION

The judgment is affirmed.  Costs on appeal awarded to Respondent.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.