Filed 4/21/25  Afshin Moghavem v. Dollar Shave Club CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| AFSHIN MOGHAVEM, INC., | B326495 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV27360) |
| v. | |
| DOLLAR SHAVE CLUB, INC., | **REDACTED OPINION FOR PUBLIC VIEW**\* |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Doniger/Burroughs, Stephen M. Doniger and Benjamin F. Tookey for Plaintiff and Appellant.

---

\*      This case involves material from a sealed record.  In accordance with California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We order the unredacted version of this opinion sealed.

Beffa Law, Darin T. Beffa; Buchalter, Mark T. Cramer and Jessica M. Hawk for Defendant and Respondent.

* * * * * *

In July 2016, respondent Dollar Shave Club (DSC) and appellant Afshin Moghavem, Inc., doing business as AMI, Inc. (AMI), entered into a consulting agreement through the execution of the "Amended and Restated Consulting Agreement" (ARCA), the contract at issue in this case. Under the ARCA, AMI agreed to help DSC build a factory to produce its own razors. The plan was known as Project Quantum (Project Q).

In August 2019, AMI filed its complaint against DSC for breach of contract and breach of the implied covenant of good faith and fair dealing. The operative complaint, filed in September 2021, added causes of action for intentional misrepresentation, concealment, and negligent misrepresentation.

Following separate motions, the trial court first summarily adjudicated AMI's breach of contract claim and later summarily adjudicated AMI's remaining claims. The trial court entered judgment in favor of AMI on its breach of contract claim for $226,209.65 and in favor of DSC on all other causes of action.

AMI appeals from the judgment, arguing both summary judgment rulings and related evidentiary rulings were erroneous. We affirm.

## FACTUAL BACKGROUND

**Relationship of the parties**

DSC specializes in direct-to-consumer subscription razor blade services. DSC and AMI entered into a consulting agreement in November 2014. The purpose of the consulting agreement was for AMI to assist DSC in building proprietary razor manufacturing capabilities to bring DSC's blade production in-house. Because AMI had access to confidential information, the agreement contained a nondisclosure provision.

The consulting agreement led to Project Q, through which AMI would build a facility to manufacture DSC blades. On February 3, 2016, DSC's board of directors approved Project Q. Michael Dubin, DSC's then-chief executive officer, testified the board of directors approved "an initial investment amount" for a manufacturing facility to manufacture razors for DSC. That same day, Dubin sent an e-mail to AMI stating, "Great work today guys. We got the green light. Here we go!"

In July 2016, the parties began negotiating a revised agreement. The ARCA was executed by the parties on or around July 15 or 16, 2016. The ARCA extended the term of AMI's consultancy through July 8, 2019. The ARCA included the following terms:

"4. <u>Term.</u> The engagement of [AMI] shall commence as of the Commencement Date and shall continue for a period of three (3) years, terminating on July 8, 2019. This Agreement may be terminated by either party at any time, upon thirty (30) days['] advance written notice to the other party, provided that (1) Sections 7, 8, and 10 through 14, inclusive, shall survive any termination or expiration of this Agreement, and (2) if this Agreement is terminated by [DSC] without Cause prior to July 8,

3

2018 (the 'Initial Term'), [DSC] will continue to pay [AMI] for the remainder of the Initial Term (either in equal monthly payments or in a lump sum, at [DSC]'s election), provided that [AMI] shall execute a full release of claims, whether known or unknown, against [DSC].

"5. [AMI]'s Compensation.

"a. Cash Compensation. [DSC] shall pay [AMI] for the Services hereunder the sum of $400,000 on an annual basis, payable as follows: $33,333.33 paid on the first of [*sic*] business day of each calendar month. . . .

"b. Option. In addition to any other option or other equity to purchase [DSC]'s common stock that [AMI] has at the Commencement Date, subject to approval by [DSC]'s Board of Directors (the 'Board'), [DSC] anticipates granting [AMI] an option to purchase an additional 203,106 shares of [DSC]'s common stock at the fair market value as determined by the Board as of the date of the grant ('Additional Option Grant'). . . . (iii) 101,553 shares subject to the Additional Option Grant will vest upon the milestone (the achievement of which shall be reasonably determined by the Board) of [DSC]'s first commercial shipment of proprietary razors manufactured in the factory for which [AMI]'s Services have been engaged under this Agreement on or before September 30, 2018, provided this milestone shall be achieved if [DSC] at any time decides to not fully fund the factory as already approved by the Board for a reason other than one related to [AMI]'s performance, the ability of [AMI] to deliver a satisfactory razor manufacturing facility by the milestone date or the quality of razors produced by the factory.

"1. If there is a Change of Control . . . prior to the approval of the Additional Option Grant by [DSC]'s Board of

4

Directors, [DSC] will make reasonable accommodation to pay [AMI] the equivalent value based on the consideration to stockholders in such Change of Control . . . .

"8. <u>Confidential Information.</u> . . . [¶] . . . [¶]

"c. <u>[AMI]'s Representations and Covenants; Non-Disclosure.</u> In reliance on [AMI]'s representations, warranties and covenants, from time to time [DSC] may permit [AMI] to have access to Confidential Information, to the extent necessary and for the sole purpose of enabling [AMI] to perform the Services to [DSC]. Subject to Section 8(b), while associated with [DSC] and at any time after termination of [AMI]'s Services or association with [DSC], [AMI] represents, warrants and agrees that if [DSC] permits [AMI] to have access to Confidential Information, [AMI] will use such Confidential Information only in a fiduciary capacity for the benefit of [DSC], and will not use, disclose, or disseminate, directly, or indirectly, any Confidential Information, except as required to perform the Services."

**Unilever acquisition**

Shortly after the ARCA's execution, DSC was acquired by Unilever. AMI learned of DSC's impending acquisition by Unilever at some point between the execution of the ARCA and the execution of the Unilever acquisition. "As a result of DSC's acquisition by Unilever, Inc., any vested stock options grants under Section 5(b) of the ARCA were converted to cash equivalent awards, e.g., the Milestone Award was cashed into a $3,081,259.14 option payment. Further, DSC's Board was replaced by Unilever executives."

5

**¶12** On December 5, 2016, AMI learned DSC was "approved to move forward with [Project Q] as proposed," subject to certain conditions relating to Unilever oversight.

AMI asserts in late 2017 or early 2018, DSC decided not to fund the factory's purchase of a two-blade assembly machine. By September 30, 2018, the milestone deadline had arrived and there had not yet been a commercial shipment from the factory. The factory was over budget and behind schedule. By September 30, 2018, the funding provided for the factory had already greatly exceeded the amounts approved by DSC's board of directors in 2016.

On December 18, 2018, Dubin communicated via e-mail that "*[t]he 6x needs some more work before [I] feel comfortable launching it; but the 4x is ready to go.*" The factory began commercial shipments sometime after the milestone date.

**Patent infringement lawsuit**

Starting in December 2015 and continuing until April 2019, DSC was a defendant in a federal patent infringement lawsuit brought by the Gillette Company.

---

[1] Sam Hacohen, who "worked for the company that owned the [Project Q] Factory," which was a wholly owned subsidiary of DSC,

[2] In support of these facts, AMI initially cited only its own responses to interrogatories. In October 2024, this court received a supplemental sealed record from the trial court and permitted supplemental briefing and citations to the supplemental sealed record. Upon this court's receipt of the supplemental sealed record, AMI has provided citations to evidence in the record supporting the implementation of these new requirements.

6

AMI asserts DSC delayed the shipment of AMI-produced blades from December 2018 (after the milestone date) to sometime in 2019 due to the pending litigation with Gillette, which concluded sometime in 2019 and before the date of the first AMI shipment from the factory.[3]

**Modification and termination of contract**

The contract's "initial term," as set forth in section 4 of the ARCA, terminated on July 8, 2018. After that date, DSC was entitled to terminate the contract without cause upon 30 days' notice without any continuing financial obligation to AMI. In early September 2018, DSC proposed lowering AMI's monthly compensation under ARCA section 5.a.[4]

On January 9, 2019, AMI wrote "we [are] clear on the new rate of $250K but again my understanding was that it was to start on [*sic*] January 2019. There was nothing in writing on this and thus I have nothing to forward you. As for this issue, I will accept your October 1 date as I don't wish to go back and forth on this."

---

[3] AMI cites no available evidence to support this fact other than the trial court minute order. As our review is de novo on appeal, we decline to consider the trial court order as sufficient evidence of these facts. (*Ruoff v. Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627 [appellate court reviews the record to determine the prevailing party's entitlement to summary judgment in its favor].)

[4] While AMI makes various assertions regarding the parties' negotiations, the citations are to redacted evidence in the original record. No updated citations were provided upon receipt of the supplemental sealed transcript.

7

After August 2018, DSC stopped paying AMI. On November 8, 2018, DSC's global controller e-mailed AMI stating, "I am in agreement with you that you are currently owed Sept, Oct, & Nov of 2018." The first two installments of the "Additional Option Grant" were paid, but the third was not. Dubin wrote to AMI in January 2019: "The contract is pretty firm on this point. The factory is still not ready and the date has passed." In general, there were "significant cost overruns" in getting the factory up and running.

## PROCEDURAL HISTORY

### Allegations

The operative complaint, filed in September 2021, alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation and concealment.

The breach of contract cause of action alleged DSC failed to pay AMI its monthly consulting fees from September 2018 through July 2019. In addition, it asserted breach of contract based on DSC's failure to pay the $3,081,259.14 that vested upon completion of the milestone contemplated in section 5.b. of the ARCA. The complaint alleged the milestone was achieved when DSC decided not to "'fully fund the factory as already approved by the Board' by, *inter alia*, denying the purchase of an assembly machine for the two-blade razor and thereby ceasing the factory's production of the two-blade razor."

In its cause of action for breach of the covenant of good faith and fair dealing, AMI asserted DSC instituted a spending freeze, required a redesign of the factory, required different razor designs and assembly machines, prohibited shipments, and failed

to obtain timely approvals from regulators, among other things. The causes of action for misrepresentation and concealment were focused on Dubin's statement that the factory project had been approved. AMI also asserted DSC failed to disclose it was being acquired by Unilever and was in active litigation involving Gillette.

In a cross-complaint, DSC asserted claims for declaratory judgment, seeking a declaration that DSC owed no more than the reduced monthly compensation to AMI, among other things.

**Discovery disputes**

In August 2020, AMI moved to compel further responses to discovery from DSC. AMI asserted, among other things, that DSC was providing "boilerplate objections on the basis of needing a protective order" and failed to produce a privilege log. DSC opposed the motion, asserting AMI was seeking to compel DSC to produce privileged and protected information. The trial court held oral argument on AMI's motion to compel and ordered certain documents to be produced to AMI within 15 days. After taking the matter under submission, the trial court ordered DSC to provide a privilege log and denied AMI's motion with respect to certain inspection demands and deposition responses.

DSC requested the trial court to strike, on privilege grounds, AMI's allegations regarding the impact of the Gillette litigation on DSC's business decisions. The trial court denied DSC's request, noting there was a pending motion to seal.

In May 2022, AMI moved to compel the further deposition of Dubin on the new misrepresentation and concealment claims asserted in the operative complaint, or alternatively to preclude Dubin from testifying to those new claims at trial. AMI also sought to advance the hearing because DSC moved for summary

9

judgment on April 7, 2022.  On May 25, 2022, following a hearing, the trial court denied the motion to compel.

**Summary judgment motions**

AMI moved for summary judgment on its breach of contract claim, seeking $341,935.44 in past due fees under section 5.a. of the ARCA and the $3,081,259.14 value of the third installment of the additional option grant.

The court found DSC owed past due fees to AMI, but found that "in September 2018 [AMI] agreed to modify the ARCA's consulting fee payments to AMI to $250,000.00 per year."  Thus, the court found "AMI is entitled to $226,209.65 in consulting fees, the amount which factors in [AMI's] modification of the ARCA."  The trial court also found AMI was not entitled to the cash payment of $3,081,259.14.  The court found "this milestone subdivision was never triggered because (1) no evidence was presented that shows that the factory made a commercial shipment by September 30, 2018, and (2) no evidence was presented that shows DSC did not fully fund the factory."

In ruling on the summary judgment motion, the trial court overruled four of DSC's evidentiary objections and two of AMI's evidentiary objections.[5]

---

[5]     AMI provides a footnote stating the trial court abused its discretion in overruling AMI's evidentiary objections and sustaining DSC's remaining objections "for the reasons stated in AMI's evidentiary objections and responses."  As AMI has failed to provide reasoned argument as to why the trial court abused its discretion, we decline to address this footnoted argument. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2014) 232 Cal.App.4th 543, 550, fn. 7 [""[A]ppellate briefs must provide argument and legal authority for the positions taken.

DSC separately moved for summary adjudication of AMI's remaining claims, as well as DSC's declaratory judgment claims. On October 24, 2022, the trial court granted DSC's motion. The court found no triable issue as to any material fact and DSC was entitled to judgment as a matter of law on the remaining claims.

As to the first cause of action for breach of contract, the trial court found a reasonable fact finder could not conclude AMI was entitled to the milestone award. In fact, the court found, "the evidence shows that the conditions precedent to such an award were never triggered."

As to the second cause of action for breach of implied covenant of good faith and fair dealing, the court found the contract "contemplated the possibility the factory might not make commercial shipments by September 30, 2018, so any delay— even if caused by DSC's business decisions—was not 'unfair frustration,' but within the contemplation of the parties." The court found there was no factual dispute no shipment was made on or before September 30, 2018, and there was no factual dispute that DSC fully funded the factory as had been approved by its Board in July 2016.

As to the misrepresentation causes of action, the court found AMI failed to allege damages related to these causes of action.

As to the concealment cause of action, the court noted this cause of action was based on "(1) [DSC's] concealment of the fact that it had never approved Project [Q] with respect to two-blade,

'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.'"'"'"].)

11

four-blade, and six-blade assembly; (2) DSC's concealment as to the Unilever acquisition; and (3) DSC's concealment as to the Gillette litigation." The court granted summary adjudication in favor of DSC for the same reason it granted summary adjudication as to the misrepresentation causes of action.

DSC's motion for summary adjudication of its cross-complaint for declaratory relief was granted. The court found its earlier discussions litigated and necessarily decided the matters at issue in the cross-complaint.

**DSC's motion to strike/seal**

On June 14, 2022, DSC filed an ex parte application for the trial court to strike facts from AMI's opposition to DSC's motion for summary judgment DSC claimed were protected by privilege and work product. DSC supported its motion with a declaration from its general counsel and trial counsel. AMI opposed the motion. After a hearing, the trial court directed DSC to lodge a proposed order, which was entered. The trial court then issued a minute order and signed a stipulation and order related to the filing and sealing of certain records.

On June 24, 2022, the trial court issued a minute order striking certain material from the record. The court granted in part DSC's application to strike privileged information from the record, finding certain items "protected by the attorney-client privilege, the attorney work product doctrine, or both." On July 10, 2022, AMI filed public redacted versions of certain documents, and lodged under seal unredacted versions of those documents, in light of the court's order.

**Judgment and appeal**

Judgment was entered November 15, 2022. On January 13, 2023, AMI filed its notice of appeal from the judgment.

## DISCUSSION

### I. Applicable law and standards of review

We review the trial court's rulings on the summary adjudication motions de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) "In performing our independent review, we apply the same three-step process as the trial court." (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 642.) We first look to the pleadings to determine the elements of the causes of action for which relief is sought. We then examine the moving party's motion to determine if the causes of action lack merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. Finally, if the moving party has met its burden, the burden shifts to the opposing party to make a prima facie showing of the existence of a triable issue of material fact. (*Ibid.*)

In reviewing the trial court's rulings on DSC's privilege claims, where there are conflicting facts, "we will affirm a trial court's finding if it is supported by substantial evidence." (*City of San Diego v. Superior Court* (2018) 30 Cal.App.5th 457, 466.) Once a party claiming the privilege establishes facts necessary to support a claim of privilege, "'the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential.'" (*Ibid.*)

13

The standard of review of the trial court's findings on the parties' evidentiary objections is abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

## II.   Breach of contract

AMI asserts DSC breached the contract by failing to pay AMI $341,935.44 under section 5.a. of the ARCA in unpaid monthly fees from September 2018 to July 2019, and by failing to pay AMI $3,081,259.14 under section 5.b.(iii), which AMI claims vested when DSC decided not to fully fund the factory as already approved by its board. We discuss each of AMI's arguments below.

### A.   *Monthly fees*

DSC did not dispute the validity of the ARCA or that DSC owed AMI fees. Instead, DSC argued, and the trial court found, the parties modified the amount owed for fees. Specifically, the trial court found "in September 2018 [AMI] agreed to modify the ARCA's consulting fee payments to AMI to $250,000.00 per year." AMI argues there was never a meeting of the minds nor was there consideration for this fee reduction. Further, AMI argues Civil Code section 1698 requires performance for an oral modification of an agreement to be enforceable, and DSC never performed. As set forth below, we reject AMI's arguments and find the parties did agree to modify the ARCA, resulting in lower monthly payments to AMI.

#### 1.   *Meeting of the minds*

For an agreement to be enforceable, its terms "must be sufficiently definite." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) Material terms cannot be left unsettled. (*Apablasa v. Merritt & Co.* (1959) 176 Cal.App.2d 719, 729–730.) AMI argues DSC's evidence shows no enforceable

14

modification was agreed upon in September 2018. AMI contends the parties' communications from September 2018 through May 2019 show they had not agreed upon, nor achieved a common understanding of, all terms necessary for a modification to be enforceable. DSC argues the evidence was undisputed that AMI agreed to reduce its monthly consulting fee.[6]

Pursuant to section 4 of the ARCA, DSC had the right to terminate the ARCA without financial penalty beyond a 30-day notice period starting on July 8, 2018. The evidence shows in around September 2018 the parties began discussing reducing AMI's monthly consulting rate.[7] In late September or early October, the parties agreed on a reduced rate of $250,000 per year. Although AMI initially understood the new rate was to start January 1, 2019, AMI communicated in January 2019 that it "accept[ed]" the October 1, 2018 start date for the new rate. When DSC had not paid AMI as of May 1, 2019, AMI wrote, "I had agreed to the change in the $250,000 but DSC has taken a position that until I sign an amendment to the agreement they are not going to pay on what had been owed." Thus, the evidence reflects AMI's agreement to the new reduced fee, despite the lack of formal signed amendment.

The essential elements of contract formation consist of (1) parties capable of contracting, (2) their consent, (3) a lawful

---

[6] AMI brought the motion for summary adjudication regarding the breach of contract claims, asserting the contract issues could be determined as a matter of law based on the communications between the parties. Neither party argues that there is a factual dispute. The issue is whether the undisputed evidence reveals an enforceable contract modification.

[7] The initial reduced rate proposed was $150,000 per year.

15

object, and (4) sufficient cause or consideration.  (Civ. Code, § 1550.)  Consent of the parties must be free, mutual, and communicated by each to the other.  (Civ. Code, § 1565.)  The parties must "agree upon the same thing in the same sense." (Civ. Code, § 1580.) ""'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.'"" (*Herzog v. Superior Court* (2024) 101 Cal.App.5th 1280, 1293.)  "[A] party may accept a contract by conduct, as well as by words, and parties to a written contract may modify the contract through an additional writing." (*Cavalry SPV I, LLC v. Watkins* (2019) 36 Cal.App5th 1070, 1081.)  New or additional terms may be added by one party, and acknowledging the continued existence of the contract under such terms constitutes acceptance of the terms.  (*Ibid.*)

The evidence in the record shows AMI expressed its agreement to the new, lower monthly fee.  The reasonable interpretation of AMI's written expressions of agreement are subject to only one conclusion: AMI agreed to the lower payment and agreed to the start date of October 2018.

AMI argues because the parties never executed a proposed formal written amendment circulated in December 2018, the proposed modification of the contract was not enforceable.  AMI asserts DSC represented the fully executed modification was a prerequisite for triggering any reduced compensation.  AMI fails

16

to cite evidence in the record in support of this argument, therefore we decline to address it.[8]

### 2. *Consideration*

AMI further argues the proposed modification lacked consideration. AMI cites *Columbia Casualty Co. v. Lewis* (1936) 14 Cal.App.2d 64, 72, for the proposition that an agreement to continue doing things already bargained for lacks consideration. AMI points out that in November 2018, DSC's then-controller admitted DSC owed AMI compensation under the ARCA for September to November 2018. AMI argues "past employment . . . is inadequate consideration." (*Simmons v. California Institute of Technology* (1949) 34 Cal.2d 264, 272–273.) AMI points out it was already required to perform consulting services for DSC, and DSC was already obligated to pay AMI a certain rate in exchange for those services. AMI cites Civil Code section 1698, subdivision (c) for the proposition that "a contract in writing may be modified by an oral agreement supported by new consideration."

---

[8] Throughout both AMI's opening brief and reply brief, AMI provides citations to the parties' separate statements without providing citations to actual evidence—or, in some cases, provides citations to redacted or sealed evidence that were not updated upon receipt of the supplemental sealed record. "[A] separate statement is not evidence; it *refers* to evidence submitted in support of or opposition to a summary judgment motion. In an appellate brief, an assertion of fact should be followed by a citation to the page(s) of the record containing the supporting evidence." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4.) We decline to consider any citations to the separate statement not supported by citations to accessible, competent evidence in the record.

17

AMI's continued employment as a consultant served as sufficient consideration for the contract modification. "[E]mployees must be bound by amendments to [contract] terms, with the availability of continuing employment serving as adequate consideration from the employer." (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 15.)  By September 2018, DSC had the right to terminate the ARCA with no financial penalty upon 30 days' notice.  DSC had no continuing obligation to employ AMI at the time the modification was proposed.  Thus, DSC's "agreement to forebear to exercise [its] legal right" to terminate AMI's employment was "sufficient consideration."  (*Coldwell Banker & Co. v. Pepper Tree Office Center Associates* (1980) 106 Cal.App.3d 272, 280, disapproved on other grounds in *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1370.)  DSC's agreement to continue employing AMI was sufficient consideration.[9]

### 3. *Civil Code section 1698, subdivision (b)*

AMI further argues that Civil Code section 1698, subdivision (b) "invalidates oral contracts of modification that are unexecuted." (*D.L. Godbey & Sons Const. Co. v. Deane* (1952) 39 Cal.2d 429, 432–433)  AMI argues the trial court found an oral modification of the written contract occurred in September 2018, but DSC never paid AMI any of the reduced compensation the parties purportedly agreed to.  AMI argues because there was no performance, any purported modification was invalid under Civil Code section 1698, subdivision (b).

---

[9]     *Goodman v. Citizens Life & Cas. Ins. Co.* (1967) 253 Cal.App.2d 807, 817–818, cited for the first time in AMI's reply brief, was decided prior to the Supreme Court's decision in *Asmus v. Pacific Bell, supra*, 23 Cal.4th 1, therefore we decline to consider it.

The modification in this matter was not oral. It was evidenced in writing. Under Civil Code section 1698, subdivision (a), a contract in writing may be modified by a contract in writing. As set forth above, AMI agreed multiple times, in writing, to the new payment and start date. AMI unequivocally stated, in writing: "Consulting fee: Kevin is correct that we were clear on the new rate of $250K . . . . I will accept your October 1 date as I don't wish to go back and forth on this." Although the parties did not sign the formal written amendment circulated in December 2018, the modification was formalized through written e-mail exchanges. E-mail communications may create a binding agreement if such communications evidence outward manifestations of consent. (*J.B.B. Investment Partners Ltd. v. Fair* (2019) 37 Cal.App.5th 1, 11.) The communications between AMI and DSC reflect such manifestations of consent, thus constituted an enforceable written modification to the ARCA. Because there was an enforceable written modification to the ARCA, the trial court properly calculated the amount AMI is owed at $226,209.65.

### B.  *Milestone option*

The ARCA lays out a three-part test for determining whether the milestone payment would vest. The milestone payment would vest if (1) DSC made "a first commercial shipment of proprietary razors manufactured in the factory for which [AMI's] Services have been engaged under this Agreement on or before September 30, 2018," or (2) "if [DSC] at any time decide[d] to not fully fund the factory as already approved by the Board." Notwithstanding the above, the milestone payment would not vest if the decision not to fully fund the factory was based on AMI's "performance, the ability of [AMI] to deliver a

19

satisfactory razor manufacturing facility by the milestone date or the quality of the razors produced at the factory." The ARCA gives DSC's board of directors the right to "reasonably determine[]" whether the milestone was achieved.

AMI challenges the trial court's determination that AMI did not achieve the milestone payment. AMI argues regardless of the milestone date, the third installment vested if DSC "at any time decides to not fully fund the factory as already approved by the Board." AMI argues the only factory approved by the Board was the razor manufacturing facility that was to produce a three-razor assortment—two-, four-, and six-blade razors. AMI argues DSC's decision not to fully fund production of the two-blade razors necessarily caused the milestone option to vest. However, AMI cites no evidence supporting its position that the approved original plan required the Project Q factory to produce and ship two-blade razors.

AMI has provided citations to the supplemental sealed record in which Hacohen testified, [10]

AMI has failed to cite evidence showing that, as part of the second triggering event, DSC was required to proceed with the manufacture of three different types of razors.[11] The contract

---

[10] In its supplemental briefing, AMI also cites Hacohen's This testimony does not lend support to AMI's argument that production of the two-blade razor was an essential component of the factory as previously approved.

[11] Having failed to cite sufficient evidence in its opening brief, AMI provides approximately four pages of citations in its reply brief, purportedly supporting AMI's assertion that the two-blade razor was an essential part of the "factory as already approved." DSC filed a motion to strike these new citations, as they were not

20

contains no specific meaning of the words "fully fund the factory as already approved by the Board," but this portion of the contract generally contains no restrictions or qualifications on the types of razors to be produced.[12] In the absence of specific language including all three types of razors in DSC's obligation to "fully fund the factory as already approved," we decline to find such a requirement exists. Our role is to "ascertain and declare what, in terms and substance, is contained in [the] contract," and we may not "insert in the contract language which one of the parties now wishes were there." (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486.) We may not add a requirement that DSC manufacture all three types of razors where no such requirement exists.[13]

---

provided in the opening brief and DSC did not have an opportunity to respond to the citations. We deny the motion to strike and conclude the citations do not support AMI's position that the funding DSC's board approved required the manufacture of two-blade razors.

[12] In response to a question as to whether the board approved the factory, Dubin testified "the board . . . approved an investment amount for a factory." He clarified, "when you say did they approve the factory, I would say they approved of the idea that it was strategic and important and then an investment amount to that—towards that project."

[13] AMI points out the contract used the word "factory," not "budget" or "investment amount." As noted above, the contract also did not use the word "razors" or "blades," nor did it insert any specifics regarding what types of razors had to be produced by the factory in order for it to be considered fully funded as approved.

Undisputed evidence shows DSC fully funded the factory. At no time did DSC withdraw funding for the factory or withdraw from the project. Jose Zuniga, chief financial officer for DSC, testified the factory was over its approved budget. He stated, "By September 30, 2018, the funding provided by DSC toward completion of the razor factory in Israel had already greatly exceeded the amounts approved by DSC's Board of Directors by July 2016." Afshin Moghavem, the president of AMI, admitted he was told there were "significant cost overruns in constructing and getting the Israel factory ready for launch." AMI has failed to point to evidence suggesting DSC failed to fully fund the factory, and the evidence before us unequivocally suggests it was fully funded.

AMI's claim for breach of contract due to DSC's nonpayment of the milestone payment was properly summarily decided in favor of DSC, as there is no triable issue as to whether the prerequisites for the milestone payment were met. The undisputed evidence shows they were not.

## III. Breach of the implied covenant of good faith and fair dealing

AMI argues even if the milestone payment did not vest, AMI should have nonetheless received the installment because DSC unfairly interfered with, and rendered impossible, AMI's ability to earn that benefit under the ARCA.

### A. *Applicable law*

In every contract there is an implied promise of good faith and fair dealing requiring that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) A defendant breaches a contract when it

22

"unfairly frustrates the agreed common purposes," "disappoints the reasonable expectations of" the plaintiff, or deprives the plaintiff of the contract's benefits. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395.) "[B]reach of a specific provision of the contract is not a necessary prerequisite" to finding a breach of the implied covenant. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.) Instead, we must determine whether the defendant's conduct, though not expressly prohibited, falls "within the reasonable expectations of the parties." (*Id.* at p. 374.) Conduct constituting a lack of good faith exists where the "plaintiffs did not assume the risk" of such conduct or "to the extent that the lack of cooperation was not shown to be justifiable." (*Jacobs v. Tenneco West, Inc.* (1986) 186 Cal.App.3d 1413, 1418.) The complaining party must present evidence the other contracting party took certain actions to "unfairly frustrat[e] the other party's right to receive the *benefits of the agreement actually made*." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349.)

### B. *Analysis*

In support of its argument that DSC breached the covenant of good faith and fair dealing, AMI describes DSC's "months-long work stoppages; hiring and design freezes; new building and lease conditions; whiplash of assembly machine and product approvals, disapprovals, and re-approvals; belatedly assigning responsibility for handles to the factory . . . ; and simultaneously requiring consumer testing in the U.S. but not allowing product to be shipped there." The record does not support AMI's position the alleged delays were unjustifiable or outside the reasonable expectations of the parties.

AMI asserts DSC prohibited the factory from commencing any shipments, including planned initial launches into smaller markets.[14] AMI claims DSC's marketing and software engineering team was not aware of the September 30, 2018 deadline and were provided no instruction to ready the Web sites for the launch of the factory's products, and DSC failed to timely obtain approvals for European regulators for auxiliary products included in DSC's subscription sets.[15] There is no evidence supporting these claims.

Further, AMI fails to cite to any evidence showing the razors would otherwise have been ready for shipment prior to September 30, 2018. In an e-mail dated December 18, 2018—

---

[14] As support for this contention, in its opening brief AMI cited only its own interrogatory responses, with no other supporting evidence, which is insufficient. AMI may not rely on its own interrogatory responses as evidence supporting its opposition to the motion for summary judgment. (*Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 450 [noting "the responding party may not use its own interrogatory responses in its own favor"]; see Code Civ. Proc., § 2030.410.) We decline to consider AMI's own interrogatory responses, without more, as sufficient evidence to create a triable issue of material fact. In the sealed record, AMI cites portions of Hacohen's testimony,

[15] Again, as support for these facts, AMI initially cited only its own interrogatory responses, with no other supporting evidence, which is insufficient. (*Great American Ins. Cos. v. Gordon Trucking, Inc., supra,* 165 Cal.App.4th at p. 450.) As set forth above, AMI cites evidence in the sealed record There is no evidence supporting AMI's contention that DSC deliberately dragged its feet on getting approvals in auxiliary markets for the purpose of delaying shipments.

nearly two months after the deadline—Dubin wrote, "*The 6x needs some more work before [I] feel comfortable launching it; but the 4x is ready to go.*"  The cited evidence does not support AMI's argument. [16]

As to the Gillette litigation, AMI fails to provide evidence showing DSC's alleged decision to delay commercial shipments until the resolution of such litigation was not justifiable.  (*Jacobs v. Tenneco West, Inc., supra*, 186 Cal.App.3d at p. 1418.)  AMI fails to provide evidence as to the nature of the litigation, the basis for DSC's alleged decision, or evidence that razors were, in fact, ready to ship and did not ship solely due to DSC's delay.  "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra*, 2 Cal.4th at p. 372.)  If DSC was accused of patent infringement, it may not have been unreasonable for DSC to delay shipment of its products.  Generally, a party is permitted to take actions in its own business interests.  (*Foothill Properties v. Lyon/Copley Corona Associates* (1996) 46 Cal.App.4th 1542, 1552 [implied covenant of good faith and fair dealing "may go no farther than to act in a commercially reasonable manner"].)  The complete lack of evidence regarding AMI's accusations of delay due to the Gillette litigation undermine its ability to make out a prima facie case of breach of the implied covenant on this ground.

Further, there is no evidence any delays were outside the reasonable expectations of the parties.  To the extent such delays

---

[16]    In its supplemental briefing, AMI provides additional citations to the sealed record

were allegedly caused by the Unilever acquisition, the contract explicitly anticipated DSC might be acquired. As set forth in section 5.b.1., AMI agreed "[i]f there is a Change of Control (as defined in the Plan) prior to the approval of the Additional Option Grant by [DSC's] Board of Directors, [DSC] will make reasonable accommodation . . . ." There were no promises made that such a change in control would not cause delay. Nor is it unreasonable to expect such delays to arise after a corporate acquisition. Because the contract explicitly anticipated an acquisition of DSC, AMI cannot claim delays caused by such acquisition fell outside its reasonable expectations.

The contract expressly contemplated that AMI might not make the milestone deadline. The payment was not to be made if AMI did not make its "first commercial shipment of proprietary razors manufactured in the factory for which [AMI's] Services have been engaged under this Agreement on or before September 30, 2018." Because it was agreed upon this milestone potentially would not be reached, it was within the parties' reasonable expectations. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra*, 2 Cal.4th at p. 376 ["Marathon's termination of the lease in order to claim for itself appreciated rental value of the premises was expressly permitted by the lease and was clearly within the parties' reasonable expectations. [S]uch conduct can never violate an implied covenant of good faith and fair dealing."].) As the parties implicitly acknowledged, the first commercial shipment of proprietary razors might be delayed by any number of factors, in which case the milestone payment would not be made.

AMI has failed to present evidence that DSC's conduct was not justifiable. Further, AMI cannot show the delays that

occurred were not within the reasonable expectations of the parties. Therefore, the cause of action for breach of the implied covenant of good faith and fair dealing fails as a matter of law and summary judgment was properly granted.

## IV.    Misrepresentation/concealment

AMI pinpoints three main pieces of evidence it considers fraudulent. First, AMI claims DSC's statement that its board gave the Project Q plan "the green light," assuming those words meant that DSC's board approved only an "investment amount," constituted an affirmative misrepresentation. Second, AMI claims DSC's withholding of information regarding the Unilever acquisition, which AMI contends was withheld until after the ARCA was signed, constituted concealment. Third, AMI contends DSC's withholding of information about the Gillette litigation, which, AMI claims, DSC knew would impact AMI's ability to meet the milestone date, constituted concealment. We address each argument below.

### A.    *"We got the green light"*

To establish misrepresentation, AMI must show: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1498.)

27

AMI argues DSC's misrepresentation was Dubin's e-mailed statement that DSC's board gave the green light "to the [Project Q] factory plan as proposed." AMI provides no citation to the record supporting its position Dubin specified the board had approved the project "as proposed." AMI argues the statement, if true, means DSC's failure to fully fund the factory as proposed triggered the third milestone payment. If it was not true, AMI argues, it was a misrepresentation.

In making this argument, AMI has added words to Dubin's statement. Dubin's entire e-mail read, "Great work today guys. We got the green light. Here we go!" AMI presents no evidence this statement was false. In fact, the undisputed evidence shows this statement was true. Dubin testified in his deposition the board had approved the factory as "a strategic and important project" and had "certainly approved an investment amount for a factory." Dubin later explained the board "approved the green light of the project," which meant it approved "an initial investment amount." Dubin explained "the board with some exception wouldn't approve specific aspects of really any area of the business that is the domain of functional experts in a given space." However, "what the board certainly did approve was the [Project Q] to go build a factory and an initial investment amount to do that." Dubin was unaware of any documentation in DSC's business records showing "what exactly the board approved" but the board's job was "to approve things at a high level." In fact, the evidence shows the factory was ultimately completed. Given the undisputed evidence the board gave the "green light" to the project, and a lack of evidence to the contrary, there was no misrepresentation as a matter of law. There is no evidence

supporting AMI's suggestion that Dubin represented the board approved certain variations of razors.[17]

### B. *Unilever acquisition and Gillette litigation*

AMI argues DSC withheld information critical to its evaluation of the ARCA's milestone terms. The information allegedly withheld related to the Unilever acquisition and the Gillette litigation.

To establish concealment, AMI must show (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) the plaintiff sustained damage as a result of the concealment or suppression of the material fact. (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 40.)

#### 1. *Unilever acquisition*

AMI argues DSC had a duty to make full and fair disclosures to AMI based on their contractual relationship. A duty to speak "'may be voluntarily assumed by contractual undertaking'" or "'arise as an incident of a relationship between the defendant and the plaintiff.'" (*SCC Acquisitions, Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 864.) A duty to disclose may arise between "'parties entering into any kind of

---

[17]     Again, for the first time in its reply brief, AMI provides pages of citations. Most citations are to the parties' separate statements, not to actual evidence. As set forth above, the citations to actual evidence in the record do not support AMI's position that the board approved certain types of razors to be manufactured at the factory.

contractual agreement.'" (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1187.) A party to a contract is not only bound to state the truth but ""also not to suppress or conceal any facts within his knowledge which materially qualify those stated."'" (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 613.) This is particularly true where one party has superior knowledge, and the other party is "not in a position to discover for itself" the withheld information. (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1242.)

AMI first argues DSC breached this duty by negotiating and executing the ARCA without disclosing the Unilever acquisition, which AMI was not in a position to discover for itself. AMI argues DSC knew AMI's ability to meet the milestone would be significantly affected by the acquisition, and it was critical for AMI to know of the acquisition before signing the ARCA. AMI points out the 2014 agreement included a nondisclosure provision for handling confidential information, thus there was no excuse for DSC's concealment of the Unilever acquisition until after the ARCA was signed.

AMI offers no facts showing DSC's concealment of the Unilever acquisition. The undisputed evidence shows Unilever acquired DSC after the ARCA was signed. Because the Unilever acquisition did not take place until after the ARCA was signed, AMI is unclear as to how the acquisition could have directly affected its decision to sign the ARCA.[18] If AMI means to say

---

[18] AMI's brief focuses on the acquisition itself, which indisputably took place after AMI signed the ARCA. AMI argues "DSC negotiated and executed the ARCA without disclosing the

that DSC should have informed AMI that it was in negotiations with Unilever, there is no evidence the parties knew, prior to signing the ARCA, the acquisition would definitely occur or how it would impact the building of the factory.  AMI provides no factual citations for its argument that knowledge of a potential future Unilever acquisition would have impacted its decision to sign the ARCA.  AMI offers no evidence as to when DSC and Unilever began serious negotiations,[19] how certain the impending deal was, or whether AMI's knowledge of the negotiations between Unilever and DSC would have caused AMI to refrain from signing the ARCA.

DSC provided some evidence regarding why AMI was not informed of the potential Unilever acquisition.  The negotiations were confidential, and "there were a very small handful of people that knew[;] it was strictly people that were helpful in—in preparing and finalizing the deal."  Dubin testified he did not believe the potential takeover would impact the factory timeline, stating: "I don't think anything about Unilever buying [DSC] changes anything about the manufacturing of razors or the construction of a building or the obtaining of grants or any of the things related to the delivery of the factory and the products on time and on schedule."  No one from Unilever ever informed Dubin that Unilever would have to approve Project Q.  Dubin explained he pushed for the ARCA to be signed before the

---

Unilever acquisition . . . ."  DSC could not have disclosed an acquisition that had not yet taken place.  It is undisputed that the ARCA specifically contemplated a "Change of Control" prior to the milestone payment.  Thus, an acquisition was within the contemplation of the parties at the time the ARCA was signed.

[19]

31

possible Unilever acquisition to avoid Unilever deciding on a different consultant and "locking in the financial value before the acquisition helped avoid that uncertainty for [AMI's] benefit."

AMI has failed to set forth evidence that DSC intended to defraud AMI by concealing the Unilever negotiations; that it would have acted differently had it known of the possible Unilever acquisition; or that it sustained damages from the alleged concealment of the Unilever negotiations.[20] (*Rattagan v. Uber Technologies, Inc., supra,* 17 Cal.5th at p. 40.) Because AMI has presented no evidence of these essential elements of its concealment claim, the cause of action fails as a matter of law.

### 2. *Gillette litigation*

AMI argues the same arguments apply to the Gillette litigation. AMI asserts "AMI had no reason or ability to know of any details regarding [the] litigation." AMI also claims it "did not know whether or how the pendency of the Gillette litigation would affect the factory's commencement of commercial shipments." AMI implicitly acknowledges the Gillette litigation was public information and AMI had access to such general public information concerning DSC.[21]

AMI cites several cases in support of its position that it was not required to conduct litigation-related due diligence. The cases are distinguishable. The first, *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, involved individual borrowers against a mortgage lender for fraudulent omissions regarding interest rates. In ruling on the demurrer at issue in that case, the *Boschma* court noted, "'"The fact that a false

---

[20]    In the supplemental briefing, AMI cites

[21]    The lawsuit was reported in the Wall Street Journal.

32

statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he [or she] transacts business.""" (*Id.* at p. 249.) AMI, which purported to be an experienced business in the field of razors, did not suffer from the unequal business savvy apparent in *Boschma.*[22] *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282 involved a merger in which a full disclosure was not sent to a primary shareholder affected by the merger. The defendant instead sent the shareholder's attorneys a "'different sanitized version' of the disclosure schedule which did not include" problematic stock provisions. (*Id.* at p. 288.) The alleged public document was a "'Certificate of Designation'" filed with the Delaware Secretary of State, which was admittedly available to the public, and showed the full details of the transaction. (*Id.* at pp. 288–289.) Under those circumstances, the *Vega* court stated, "[T]he contention that publicly available information cannot form the basis for a concealment claim is mistaken. The mere fact that information exists somewhere in the public domain is by no means conclusive." (*Id.* at p. 295.) Here, there is no evidence DSC provided AMI any sanitized information or intentionally concealed the existence of the litigation. Nor could it, as information about the lawsuit was publicly available not only through public documents but also

---

[22] In his complaint, the president of AMI was described as having "been involved in the razor and grooming industry since 1990. During his 29-year career, he has accumulated a trove of industry experience and successfully represented the interests and grown the brands of shaving giants all over the world."

33

through news sources. *Seeger v. Odell* (1941) 18 Cal.2d 409, 412, involved an attorney who informed the plaintiffs he "had superior knowledge of many facts concerning the land" at issue in a land sale. The plaintiffs believed his subsequent representations to their detriment. Under those circumstances, "the fact that an investigation would have revealed the falsity of the misrepresentation" would not alone bar their recovery. (*Id.* at pp. 414-415.) The *Seeger* court emphasized the plaintiffs' lack of knowledge, quoting, "'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.'" (*Id.* at p. 415.) Here, unlike in *Seeger*, DSC made no affirmative statement about the Gillette litigation meant to purposely mislead AMI. Further, as set forth above, AMI was experienced in the field and in business in general. Thus, none of the cases cited convince us that AMI had no obligation to ascertain readily available information concerning the Gillette litigation and inquire as to its impact prior to signing the contract. (*Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 166 [rejecting concealment claim because it was undisputed "the recorded easement accurately described" the allegedly concealed condition of the property; thus, if the plaintiffs "had consulted the public records, they would have learned" the information they accused the defendant of withholding].)

Regardless of whether AMI should have known of the Gillette litigation due to its public nature, AMI has failed to set forth evidence showing it would have acted differently had it known the details of the Gillette litigation. Nor is there evidence DSC knew the Gillette litigation could potentially impact the shipment of razors. There is also no evidence AMI was harmed by the existence of the Gillette litigation. While there is evidence

34

the razors did not ship until after the milestone deadline, nothing in the evidence connects that missed deadline directly to the Gillette litigation. In fact, there is no evidence suggesting the razors were ready at any time prior to December 2018, when Dubin commented, *"The 6x needs some more work before [I] feel comfortable launching it; but the 4x is ready to go."* AMI cannot survive summary judgment with innuendo and surmise. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 483 [summary judgment appropriate where plaintiff's case is based on speculations as to probabilities without evidence].)

## V.    Evidentiary issues

AMI takes issue with several of the trial court's evidentiary rulings on the grounds of privilege. AMI asserts DSC wrongly claimed certain facts pertinent to its breach of implied covenant and misrepresentation claims were privileged, and the trial court agreed without explanation or *in camera* review of the evidence. Thus, AMI argues, it was prevented from discovering and presenting relevant evidence in opposition to DSC's dispositive motion. AMI argues the error warrants reversal and remand.

AMI first takes issue with the trial court's denial of its motion to compel a further deposition of Douglas Roy, whom AMI represents was the DSC executive who oversaw the factory. Without citation to the record, AMI asserts Roy "refused to provide facts regarding DSC's actions and business decisions to stop the factory from meeting the milestone date, including disallowing any shipments until after the conclusion of the Gillette litigation." AMI provides only a citation to the court's order denying the motion after a hearing on AMI's motion to compel further discovery responses. AMI has not provided citations to a record of any specific questions Roy refused to

35

answer; the basis for DSC's objections; or any of the arguments heard and considered by the trial court.[23]  Under the circumstances, we have no basis on which to evaluate AMI's claim that the trial court abused its discretion.  (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296 [claim must be resolved against appealing party where appealing party failed to provide an adequate record]; *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 89–90 [appellant's failure to identify specific testimony and craft an argument regarding that specific testimony caused forfeiture of claim].)

AMI next raises the trial court's decision to grant DSC's ex parte application for relief seeking to strike certain evidence on the basis of the attorney-client privilege or work-product doctrine. AMI argues DSC did not comply with the requirements of Code of Civil Procedure section 435.5, admitted its documents were not protected by either doctrine, and failed to identify specifics regarding the evidence it challenged.  In support of this argument, AMI cites no evidence but only its own opposition to DSC's ex parte application.  AMI's brief is not evidence and does not support its arguments.  AMI further argues none of the evidence identified in DSC's ex parte application was identified on DSC's privilege log.  In support of this argument, AMI cites its own attorney's declaration making this same statement.

---

[23]     The supplemental briefing also makes vague references to the trial court's abuse of discretion in "allowing DSC to hide relevant facts, including those going to its decision to disallow the timely commencement of commercial shipments from the [Project Q] factory."  While AMI cites the testimony of Roy, it fails to sufficiently expand upon the argument to allow for analysis.

Again, AMI fails to identify any specific items of evidence nor the trial court's rationale for granting the ex parte application. In the absence of identification of specific items of evidence, along with the trial court reasoning, we cannot find an abuse of discretion has occurred. (*Maria P. v. Riles, supra*, 43 Cal.3d at pp. 1295–1296; *Cristler v. Express Messenger Systems, Inc., supra*, 171 Cal.App.4th at pp. 89–90.)

The remainder of AMI's evidentiary challenges to DSC's purported claims of "privilege over deposition *questions*; testimony and discovery responses that *DSC* elicited and propounded; and deposition testimony that DSC did not object to as privileged on the record" are forfeited for the same reasons. AMI provides no citations to the record showing the evidence at issue nor the trial court's rationale. Under the circumstances, we cannot determine whether an abuse of discretion occurred, and the claims are forfeited.

## DISPOSITION

The judgment is affirmed. Respondent DSC is awarded its costs of appeal.


CHAVEZ, J.

We concur:


LUI, P. J.


ASHMANN-GERST, J.


37